AMERICAN COLLEGE OF SURGEONS, Plaintiff-Appellant and Cross-Appellee, v. LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant-Appellee and Cross-Appellant.

First District (2nd Division)   No. 83—3080

Opinion filed March 25, 1986.

Roy S. Kullby, Allan E. Lapidus and Gifford R. Zimmerman, all of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellant.

James T. Ferrini, Frank L. Schneider and Katherine S. Dedrick, all of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, for appellee.

PRESIDING JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff, American College of Surgeons (hereinafter ACS), filed a breach of contract action against defendant Lumbermens Mutual Casualty Company (hereinafter LMC) alleging that defendant agreed to return to plaintiff "retention reserves" in the form of dividends for a period of 10 years after the policies terminated. ACS cancelled its policies in 1974 and, shortly thereafter, defendant informed ACS that its obligation to return reserves was only for a 20-month period after termination.

The trial court submitted to the jury the questions whether there was a contract, whether it met the requirements of the Statute of Frauds, and whether there was a breach by the defendant. The jury returned a verdict for plaintiff and awarded it $1,732,669 in damages. The trial court, which earlier had reserved ruling on defendant's motion for a directed verdict, entered judgment notwithstanding the verdict (*n.o.v.*) for the defendant and, in the alternative, granted defendant's motion for a new trial on the issue of damages. Defendant's alternative motion for a new trial on all issues was denied.

ACS appealed from the order setting aside the jury's verdict and entering judgment *n.o.v.* in favor of LMC and the alternative order granting LMC a new trial on the issue of damages. LMC filed a cross-appeal from the order denying its alternative motion for new trial on all issues.

The issues presented are: (1) whether it was error for the trial court to set aside the jury's verdict for the plaintiff and to enter judgment *n.o.v.* for defendant; (2) whether it was error for the trial court

to conditionally grant a new trial on the issue of damages; and (3) whether it was error for the trial court to deny defendant's motion for a new trial on all issues.

This case presents a historical review of the inception, underwriting, and administration of the mass marketing of insurance policies. In the 1950's, the insurance industry was emerging from what now appears to be a rather primitive method of having an insurance company agent or salesman sell a policy to a customer on an individual basis. A new breed of entrepreneur emerged that became known as the "Administrator." He sought out large groups of potential insurance purchasers through their professional, trade, or craft associations, determined their insurance needs, and tailored a program to fit their requirements. Armed with this potential group sale, the Administrator shopped various insurance companies for the best deal in terms of benefits and cost. Ideally, everyone would benefit. The group members purchased insurance at lower prices than they could individually. Insurance companies that underwrote the group program benefited because they could put a block of business on the books at a lower acquisition cost per policy. Associations benefited by providing an additional service for their members, and the Administrator earned a fee or commission.

The Administrator sells the association on the idea of offering such a program and, if successful, "markets" the program among the members to induce them to place their insurance through the program. The Administrator receives the applications and the premiums, sends them on to the insurance company-underwriter, and ultimately returns certificates of insurance to the participating members. For these functions, the Administrator receives a commission on the premiums collected.

The insurance company-underwriter negotiates with the Administrator and the association with respect to the benefits and premium rates, and issues a "Master Benefits Policy" to the association. Upon receipt of applications for insurance from the Administrator, the insurance company determines whether to accept the applicant within the range of premiums and benefits defined in the master policy and issues a "Certificate of Insurance" for return to the association member. Out of the gross premium, the insurance company pays the Administrator's commission, pays its own out-of-pocket expenses, and invests the remainder, called "reserves," in income-producing securities. From the reserves and the investment income derived therefrom, the insurance company pays all claims under the policies, and, absent any agreement to the contrary, keeps any remainder as profit for itself.

Although the benefits of group insurance were obvious, the main concern of the insurance company-underwriter was fixing a premium that would be attractive to the group and profitable to the company. On the other hand, the association group was concerned with protecting its members against unreasonably high premiums and excessive profits by the Administrator and the insurance company-underwriter.

In the 1950's, when the association group business first started, the practice of association policyholders' seeking to limit the Administrator's commissions or insurance company's profits did not exist because no one realized that such programs would become so profitable; however, large association policyholders, such as ACS, began to make demands to limit profits so that the cost of the insurance would be reduced. During the 1960's and 1970's, agreements limiting commissions and insurance company profits and providing for refunds of any surplus or excess reserves to policyholders began to appear. Such arrangements became commonly known in the insurance industry as "retention basis underwriting" or "retention and dividend agreements."

"Excess reserves" or "surplus" in a program are distinguished from "claim reserves." The "claim reserves" are the portion of premium income which, according to the insurance company's actuarial department, must be set aside to pay presently pending and future claims. The claim reserves are counted as being already among the "losses" under the program, even though the money has not yet been actually paid out. "Excess reserves," "surplus," or "contingency reserves" are the amounts remaining that are not considered necessary to pay present or expected claims.

"Retention" is the percentage of premium that by agreement is set aside to cover insurance company out-of-pocket expenses, including commissions paid, plus a certain percentage called the "insurance charge," in order to provide an agreed-upon profit margin for the insurance company. The insurance company's investment of the reserves remained an important source of its income in addition to the insurance charge.

Such retention and dividend agreements were negotiated and entered into through correspondence, memoranda, and accounting reports, and have never been written into the master policies themselves. Even when such a "retention and dividend" agreement existed, the master policies have continued to cover only insurance matters such as premium rates and the definitions of the benefits and exclusions under the policy.

ACS is a not-for-profit corporation headquartered in Chicago,

whose members are 46,000 physicians who practice surgery throughout the world. LMC is an Illinois insurance corporation organized under the Illinois Insurance Code. It is headquartered in the Chicago area and is part of what is known as "The Kemper Group" of companies.

In the early 1950's, insurance administrator Charles O. Finley sold the ACS on the concept of offering its members a group insurance program. This initial program was underwritten by another carrier. The program was switched to LMC in 1956. Three types of coverage were available to ACS members: (1) disability income protection; (2) major hospital expenses; and (3) accidental death and dismemberment (AD&D). Under the program, ACS was the master policyholder for the benefit of its participating members. The premiums generated in the ACS/LMC program rose to over $5 million per year and totaled over $68 million from its inception with LMC in 1956 until termination in 1974.

By 1961, ACS became concerned about its insurance costs. It requested LMC to provide a special report on commissions, expenses, and profits for the year ending September 30, 1961. To analyze the reports and to negotiate a reduction in costs with Finley and LMC, ACS hired Harold W. Torgerson, professor of finance at Northwestern University, as its agent and consultant. Professor Torgerson had previously represented other medical associations in negotiations with insurance companies, including LMC.

During 1962, Professor Torgerson had a series of meetings with representatives of LMC. In May 1962, Torgerson met with Finley and four officers of LMC. They discussed increasing the major hospital premium, reducing Finley's and LMC's charges, and Finley's and Torgerson's suggestion that any "surplus" or "excess reserves" should be recognized as the property of ACS and paid to ACS at some future date or in the event of cancellation.

The parties reached an agreement that all calculations concerning reserves would be made as of the date of the program's inception, and the parties agreed on profit margins. On January 2, 1963, LMC made a written presentation of how the calculations of dividends would be made and entitled the document, "Illustrative Dividend Projections for years ending Dec. 31, 1962 through 1965." Ultimately, all the elements of the retention and dividend agreement were incorporated into the so-called "Experience for Dividend" report that was valued as of January 1, 1964. It is these "Experience for Dividend" reports that form the basis for ACS's claim that LMC agreed that ACS owned the reserves because the reports contain formulas for

both the calculation and distribution of the dividends.

LMC presented these reports at each of eight succeeding annual insurance meetings with ACS. Professor Torgerson testified that ACS had agreed to an increase of its premiums, resulting in greater reserves, because ACS assumed that it owned the reserves. Relying on the annual "Experience for Dividend" reports, ACS renewed its policies yearly.

In 1970, ACS learned of a controversy regarding the ownership of reserves between LMC and another medical association. Torgerson testified that he asked Vernon Lauberstein, underwriting manager of LMC, whether that dispute affected ACS in any way. Lauberstein responded that ACS owned the reserves and, therefore, was not affected. Lauberstein testified that he did not recall the conversation.

In 1971, ACS asked LMC to combine the reserves from the AD&D policy with those of the major hospital and disability income protection policies. Until that time, the AD&D policy was in a "pool" with others insured by LMC. In "pooled basis" underwriting, there is no commitment by the insurer to limit its profits or to return any excess reserves to the insured. Torgerson testified that ACS wanted the AD&D out of the pool so that it could own the reserves. LMC agreed, but a dispute arose about the amount of money to be taken out of the pool. James O. Peterson, an assistant vice-president of LMC, wrote in a letter in 1972 to Robert C. Happ, ACS's comptroller, that stated in part: "Unlike your Disability and Major Hospital programs, up until now, the AD&D program has been pooled with that of other associations." The conclusion that ACS drew is that the reserves of the other two policies belonged to ACS.

On June 29, 1972, Peterson wrote another letter to Happ that refined the proposal. The letter read in part that: "All three of your programs will be combined for dividend evaluation and investment income credits." The proposal was ratified by both parties. Peterson testified that LMC had prepared professional group plans that outlined a 20-month payout period that was not reported to ACS. In contrast, the annual "Experience for Dividend" reports that were presented to ACS did not contain any reference to a 20-month period.

Theodore J. Kowalchuk, an expert on group insurance matters, appeared on behalf of ACS. He testified that the illustrative and actual "Experience for Dividend" reports from 1963 to 1976, and the 1972 correspondence combining the AD&D policies with the others on a retention basis, expressed an agreement whereby LMC would return excess reserves to ACS under a formula over a period of 10 years after termination. LMC, in turn, argues that the formula shows

merely a method of calculation and is not a statement that ACS owned the reserves or that they were to be paid out over a 10-year period. LMC did not present any expert witnesses.

The disintegrating relationship between the parties ended at the annual insurance meeting on January 30, 1974, when C. Rollins Hanlon, executive director of ACS, announced that ACS was exercising its right to end the policies on their anniversary dates—April 1, May 1, and June 1, 1974. A year later, January 21, 1975, Peterson brought Happ the first post-termination "Experience for Dividend" report dated January 1, 1975. Peterson also told Happ that LMC would not pay dividends after January 1, 1976. After LMC refused to provide any more information for the years 1977 and beyond, plaintiff filed suit.

## I

### THE *PEDRICK* RULE

■ The Code of Civil Procedure provides that relief heretofore sought by a reserved motion for directed verdict or motion for judgment *n.o.v.* must be sought in a single post-trial motion. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1202(b).) The grounds for relief sought by either motion are the same.

In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, our supreme court established a single standard for directing verdicts and entering judgments *n.o.v.*: "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." 37 Ill. 2d 494, 510, 229 N.E.2d 504.

Defendant's post-trial motion, insofar as it seeks a judgment *n.o.v.*, presents the issue of whether all the evidence, when viewed in the aspect most favorable to the plaintiff, so overwhelmingly favors defendant that no contrary verdict based on that evidence could ever stand.

■ The trial court may not substitute its judgment for that of the jury merely because "the trial judge believes a different conclusion would be more reasonable." (*Bank of Marion v. Robert "Chick" Fritz, Inc.* (1974), 57 Ill. 2d 120, 126, 311 N.E.2d 138.) In *Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 401 N.E.2d 1145, the trial court's grant of judgment *n.o.v.* was reversed because there was evidence in the record which, if believed, could support the jury's ver-

dict. (81 Ill. App. 3d 1078, 1087, 401 N.E.2d 1145.) Similarly, in its reversal of a directed verdict, the Illinois Supreme Court stated: "In our judgment the evidence in this case is not such that a verdict for plaintiff could never stand ***." (*Mort v. Walter* (1983), 98 Ill. 2d 391, 398, 457 N.E.2d 18.) In *Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 433 N.E.2d 1005, this court held: "For defendant to be awarded judgment notwithstanding the verdict, it must be proved that plaintiff's assertions could never amount to [what plaintiff claims]." 104 Ill. App. 3d 1021, 1024, 433 N.E.2d 1005.

For the judgment *n.o.v.* entered by the trial court in this case to be upheld, the evidence for plaintiff, viewed in the aspect most favorable to plaintiff, must be such that the jury verdict "could never stand" and "plaintiff's assertions could never amount to" the contract claimed to exist between the parties.

### The Agreement

■ Applying the *Pedrick* rule, we conclude that there is sufficient evidence to support the verdict of the jury in favor of plaintiff for $1,732,669.

We are dealing with a business relationship commencing in 1956 and ending in 1974. Unlike most business transactions involving substantial sums of money, this one was not evidenced by a formal structured writing that is commonplace in the business community. This exception is explained by the fact that this was a new and developing area in the insurance industry that had not yet evolved to a point that it could be relegated to a standard type of agreement. At oral argument, we were told that today this type of transaction is handled by a routine writing.

The question, therefore, is whether in the light of the circumstances existing at the time, there was a basis for the jury's finding that a sufficient written agreement existed to justify a recovery by the plaintiff.

Defendant contends that no agreement existed to transfer ownership of the reserves to ACS and to calculate these reserves for a period of 10 years after termination of the program. It characterizes plaintiff's proof as "mere fluff" and states that "Plaintiff works with mirrors."

On the other hand, plaintiff contends that the writings admitted in evidence have such probative value that "[n]o clearer example of written offer and written acceptance could be found in any textbook on the Law of Contracts."

Each party claims that the opposing briefs are permeated with

"obfuscation." This is a complex case in the sense that it involves technical terms that are unique to certain segments of the insurance industry; however, it is not a complicated case when these terms are defined by individuals who are experts in the field.

There was competent evidence presented to the jury to show that in 1956, plaintiff and defendant commenced their business relationship. Three types of policies were involved: (1) disability income protection; (2) major hospital expenses; and (3) accidental death and dismemberment (AD&D). All three policies were written on a "pooled" basis. This meant that all of the reserves that were not expended and all income from investment of the reserves were the property of LMC. Because this resulted in excessive profits to LMC, a change was made in 1964.

In that year, the disability income protection and major medical were changed to a "retention basis, dividend plan" that was retroactive to the inception of the deal in 1956. This meant that ACS, rather than LMC, would own the reserves. The AD&D remained on a pooled basis. Annual financial reports were submitted to ACS by LMC consistent with this change.

In 1972, the AD&D policy was added to the retention basis dividend plan. This combined all of the policies and related back to the inception of the deal.

The policies were always written on an annual basis. In January of each year, the parties met to review the recent and prospective experience of the three programs and to make appropriate adjustments and plans. When the excessive profits were ascertained in 1962, the disability and medical policies were put on a retention basis dividend plan when plaintiff indicated it would take its business to another company.

Again, in the early 1970's, when a large surplus was building up under the AD&D policy, discussions began at the suggestion of Professor Torgerson to take the AD&D out of the LMC pool and put it on the dividend and retention basis. When James O. Peterson, an officer of LMC, did not move fast enough, ACS considered moving its business. Prior to taking such action, J.S. Kemper, Jr., president of LMC, was advised on April 26, 1972, by a letter from Robert G. Happ, comptroller of ACS, as follows:

> "As you may know, your company is the carrier on three insurance programs for our Fellows. These are the Disability, Hospital, and AD&D programs. The first of these dates back to 1952. By agreement, the total expenses of the administrator and carrier are 21% of premiums on each of the three con-

tracts. On the first two programs, there are permitted loss ratios of 79%, and interest is credited on reserves held by your company. There is also an agreement relative to the amounts available for dividends. On the AD&D program, our group has been pooled with other similar business written by your company and there are no provisions for crediting of interest or possible payment of dividends to policyholders.

It has been the practice each year in January for Mr. Finley, the Administrator, and your representative, Mr. Peterson, (or his predecessor) to meet with our officials and review the recent and prospective experience of the three programs, and to make adjustments and plans as appropriate. *** At the mentioned meetings in 1971 and 1972, your representative stated that our AD&D premiums comprised about 70% of the pool. Our program experience has been very favorable. Your report as of September 30, 1971 shows cumulative premiums earned on this program of $4,506,877 and incurred losses of $2,342,880, with a loss ratio of 52%.
***

We think that this program should be handled similarly to our other two larger programs—that there should be a permissible loss ratio, that interest should be credited on reserves held by your company, and that there should be a formula or agreement relative to possible dividends to policyholders.

Mr. Hanlon has asked me to write to you because this important matter has been pending for 15 months since our original request. Mr. Peterson has proposed a reduction in premium rates and the liberalization of the terms of the policy. Perhaps these changes also should be made. But, there has been no word on separating our program from the pool and handling this program in the same manner as our two larger programs.

I am obligated to prepare a report to the Board of Regents by May 15 for the June meeting and need definitive action soon."

Discussions resumed promptly and resulted in an exchange of letters and delivery by LMC to ACS of *pro forma* figures illustrating the application of the agreed formula.

The offer was contained in a letter dated June 29, 1972, signed by Peterson. It stated, in part:

"1). All three of your programs will be combined for dividend evaluation and investment income credits.

2). The minimum reserve on the AD&D policy will be equal

to the annual premium (presently $365,000) or two times the maximum exposure on any one life (presently $300,000) whichever is greater.

3). The retention on the AD&D program will be 21%, which is the same as on the other two programs.

4). Subject to final approval by our Board of Directors, this program will be made effective April 1, 1972.

\* \* \*

\*\*\* Since the policy previously was not written on a retention basis, everything in excess of Expenses and Loss Incurred was placed in the Profit line.

Deducting an insurance charge and profit margin of 5% from the Total Profit of $1,188,716 leaves a balance of $817,774.

We propose that this balance of $817,774 be credited to your combined experience account (per paragraph [1 above]).

Following affirmative action by your Board of Regents, this new proposal will be presented to our Board of Directors, recommending formal adoption."

Professor Torgerson recommended that ACS accept the offer. The formal acceptance was accomplished by letter dated June 29, 1972, from Happ to Peterson, which stated:

"We are pleased to accept your proposal dated June 29, 1972 in which you offer to withdraw our AD&D Program from your pool and to credit $817,774, plus interest, at the rate of 5% per annum, to our combined experience account effective 4-1-72. This additional reserve will help the program considerably and we are very grateful for your cooperation."

Immediately thereafter, just as it had done in 1963 and 1964, LMC's actuarial department prepared and, at a meeting held on July 25, 1972, LMC presented to ACS *pro forma* figures illustrating how the effect of combining AD&D with the other two policies on the retention basis would appear on future experience for dividend reports. Professor Torgerson, Mr. Happ, and Dr. Hanlon, director of ACS, who also attended the July 25, 1972 meeting, were satisfied that the form properly expressed the agreement that had been approved by the ACS Board of Regents and accepted the form and the dividend formula contained thereon for all future reporting. In consideration for removal of the AD&D policy from the pool in 1972, ACS renewed its entire program in 1973.

Defendant contends that Peterson was not authorized to act on behalf of LMC, however, the jury was aware of the possible loss of the entire block of business by LMC, the quick action following the

letter to President Kemper, and the approval by the LMC board.

The LMC board approved the 1972 confirmation of the dividend and retention plan for the disability and hospital policies set up in 1964, and the expansion of the dividend and retention plan to include the AD&D policy. On direct examination, Peterson responded to questions by his own attorney:

"Q. And will you read to the Ladies and Gentlemen of the jury the last paragraph of the letter [Peterson's letter of 6/29/72, pl. ex. 77] on page 2?

A. 'Following affirmative action by your board of regents, this new proposal will be presented to our board of directors recommending formal adoption.'

Q. Okay. And was that program eventually submitted to your board of directors to formally adopt?

A. Yes, sir.

Q. And it was adopted?

A. Yes, sir."

To remove all doubt, Peterson repeated this testimony on cross-examination:

"Q. But the Board of Directors then approved this agreement, whatever it is, contained in Exhibit[s] 77 and 79, is that correct?

A. That is correct."

Torgerson also testified that after completion of the 1972 negotiations, the ACS board of regents adopted the new agreement as requested in the last paragraph of Peterson's offer letter of June 29, 1972. Specifically, Dr. Torgerson testified on the question of ACS board of regent approval:

"Q. After receiving the proposal from Mr. Peterson dated June 29, 1972, and the discussion at the meeting of June 29, 1972, what action, if any, did the College take with respect to the offer?

A. This offer was referred to the Board of Regents. And in due time, they gave approval and the offer was accepted and the reserves then were excess reserves and the amounts specified were combined with the excess reserves of the other two contracts."

When the trial court granted defendant's motion for judgment *n.o.v.*, it observed: "Did the Board of Directors of both companies approve a change in this plan or not? And they didn't. We never had any evidence that the Board of Directors, the Board of Regents, for the American College of Surgeons, had approved it." This obviously

was not correct. There is clear and uncontradicted evidence that the governing boards of both parties adopted the agreement that was negotiated between the parties and confirmed in the writings exchanged in 1972.

This subsequent adoption of the agreement negotiated by the respective boards not only meets the conditions contained in Peterson's June 29, 1972, letter, but is also equivalent to a grant of original authority and confirms any acts that originally may have been unauthorized. (*Reavy Grady & Crouch Realtors v. Hall* (1982), 110 Ill. App. 3d 325, 328, 442 N.E.2d 307.) LMC argues that "the only evidence of an agreement to transfer reserves is the oral testimony of Professor Torgerson," and that it was vague and equivocal; however, the record does not support this contention. There is sufficient evidence, as we have detailed, to support the existence of the agreement.

LMC contends that it does not owe ACS anything. It claims to have an agreement to continue dividend payments for only 20 months after termination and not for the 10-year period asserted by ACS. It made payments for 20 months and states it is not obligated for any more. All of LMC's witnesses testified that not one of them ever revealed LMC's "confidential" plan to cease dividend payments 20 months after termination.

Only the overt acts of the parties and the communications between them may be considered in determining whether and upon what terms they have entered into a contract. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 331, 371 N.E.2d 634.) LMC's secret, undisclosed limitation on the period for dividend payments to 20 months, instead of the 10 years expressly shown on the documents it provided to ACS, cannot be considered as being included in the parties' agreement. The 20-month limitation, which was "confidential," undisclosed to anyone outside of LMC, and known only to the LMC board and certain LMC officials, constitutes an undisclosed "mental reservation" on the part of one party to the bargain and is thus of no effect whatsoever. (Restatement (Second) of Contracts sec. 17, comment c (1981).) *Bost v. Paulson's Enterprises, Inc.* (1976), 36 Ill. App. 3d 135, 141, 343 N.E.2d 168, holds, "A contract is to be construed in accordance with the intent of all the parties and not the secret intent of one of them," citing 12 Ill. L. & Prac. *Contracts* sec. 212 (1955). In *Steinberg*, our supreme court stated: "In the formation of contracts, it was long ago settled that secret intent was immaterial, only overt acts being considered ***." (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 331, 371 N.E.2d 634, citing, 1 Williston, Contracts sec. 22, at 46-48 (3d ed. 1957).) LMC did authorize both Peter-

son's offer letter of June 29, 1972, and the formula disclosed on the "Experience for Dividend" reports. It is the agreement contained in those documents under which ACS is "entitled," as Peterson put it in his May 24, 1972, letter, to share in future profits of the program.

LMC relies on *Triscaro v. Union Labor Life Insurance Co.* (6th Cir. 1966) 355 F.2d 1, to support its 20-month limitation. We do not agree that *Triscaro* stands for the proposition that LMC has an unfettered right to unilaterally cease application of an agreed upon dividend formula. In *Triscaro*, there was no agreement between the parties as to the formula whereby dividends would be computed. The court held only that, absent specific agreement as to the methods of calculation and in the absence of bad faith, the insurer has the right to ascertain and apportion the surplus.

In this case, the LMC board included an undisclosed clause in their dividend plan that was diametrically opposed to the plan submitted to ACS. Failure to disclose such a contrary intent while showing documents that contained no hint of the contrary intent is an indication of bad faith.

LMC cannot announce, a year after termination, that the 10-year period shown on the face of the "Experience for Dividend" reports they provided to ACS is now to be disregarded because of some undisclosed intent on its part.

Applying the *Pedrick* rule, there is sufficient evidence to support the verdict of the jury as to the existence of the agreement.

### Expert's Analysis Of The Documents

In his opening statement, counsel for LMC referred to the formulas prepared by his client and submitted to ACS:

> "Then we enter what I sometimes call the boring part of the case where we get into formulas. And God knows what the formulas all mean. We will have actuaries—we, the plaintiff, and I suppose we will have some too as to what numbers mean, how factors are calculated, what numbers mean, and what other things do. I hope you will be able to follow at least some of this. I've been working on this for five years, and I have some trouble myself following it."

At trial, Theodore Kowalchuk appeared as an expert in group insurance matters on behalf of ACS. Kowalchuk explained to the jury the generally accepted meanings of all the insurance industry terminology used and appearing on all of the documents.

Kowalchuk then reviewed each of the illustrative and actual "Experience for Dividend" reports from 1963 to 1976, and the 1972 cor-

respondence relating to combining the AD&D policy with the other two ACS policies on the "retention basis" and testified:

> "My opinion is that these documents show that there was an express agreement of how this contingency reserve would be built up and apply, and that it would be returned on the same basis spelled out in these 13 or 14 years of reports and exhibits, and that it would be returned."

He further testified that the documents clearly demonstrated an agreement for the return of the excess reserves under a formula which provided that the insurance company would pay out 100% of the excess reserve over a 10-year period after termination. Kowalchuk explained how the formula protected the insurance company from premature payout for as long as actuarially necessary by virtue of the contingency reserve aspect of the formula.

Kowalchuk emphatically stated:

> "*** Every company I worked for—in the thousands of such cases that I have been involved in, I always saw the insurance company honor its commitments or its illustrations. Basically, if it presented illustrations—this is the way the program is going to work—it met its obligations, subsequently.
>
> I never saw a board of directors say, hey, we are going to throw out this agreement we made with this group policy and we are not going to pay back the money that belongs to the policyholder."

■ LMC did not present any expert witness to counter Kowalchuk's testimony. However, it does claim that the trial court committed error when it admitted Kowalchuk's testimony. A judgment *n.o.v.* cannot be entered on account of errors in ruling on the admission or rejection of evidence (*Farmer v. Alton Building & Loan Association* (1937), 294 Ill. App. 206, 210, 13 N.E.2d 652), or other matters involving the conduct of the trial which are grounds for a new trial (*Millikin National Bank v. Shellabarger Grain Products Co.* (1945), 389 Ill. 196, 200, 58 N.E.2d 892).

The documentary evidence supported by Kowalchuk's testimony demonstrates that ACS and LMC entered into an agreement under which LMC agreed to return excess reserves to ACS upon termination of the program. Under the *Pedrick* rule, the trial court should not have disturbed the verdict of the jury.

### COMPUTATION OF DAMAGES

■ Defendant challenges the manner in which damages were computed. The jury returned its verdict for plaintiff in the sum of

$1,732,669. This was based on a formula, which is part of the agreement, and was computed as of April 1, 1983, the date closest to the commencement of the trial. Plaintiff presented the testimony of Eldon Klaassen, an expert in actuarial science, to compute the amount of damages. Defendant asserts that plaintiff's computations are in derogation of fundamental principles of mathematics.

All of the documents that were reviewed by Kowalchuk, which included the illustrative and actual experience for dividend reports, 1962-1976, and the 1972 correspondence, were also considered by Klaassen. He testified that based on his 30 years of experience in the insurance industry and actuarial science, "I am of the opinion that this set of exhibits does constitute a formula for the determination of dividends payable before and after termination of a group insurance plan." After explaining the reasons for his opinion, he then made a calculation based upon the formula that resulted in a dividend due and payable, from LMC to ACS as of April 1, 1983, in the sum of $1,732,669.

On cross-examination, counsel for LMC inquired about the application of pure mathematics to the formula. Klaassen explained that based on the formula and the custom and usage in the industry, dividend calculations are based on actuarial science and not pure mathematics. He explained that calculations did not ignore negative numbers. "No. It's taken into account completely because the entire amount of the negative is included in the surplus which I have shown there, and that's why you must use that limitation, so that you cannot pay out more than the surplus that's available to the policyholder." There is no evidence in the record to support the theory that pure mathematics and not actuarial science governs the calculations under dividend formulas in group insurance programs.

Klaassen testified that he followed and agreed with LMC's application of its own formula as shown in their illustrative dividend projection documents supplied to ACS. These illustrations correctly applied actuarial science and not pure arithmetic.

The jury had the actuarial and mathematical theories before it. There is sufficient evidence to support the verdict which was the exact amount of Klaassen's computation. The *Pedrick* rule does not permit the trial court to take the verdict away from the jury.

## STATUTE OF FRAUDS

■ Although plaintiff argued that the Statute of Frauds did not apply, the trial court insisted that the case be tried on the theory that a writing within the purview of the Statute of Frauds must be estab-

lished. The trial court observed: "I am trying to get the issue in focus here. Somebody, eventually, is going to have to decide whether these agreements had to be in writing or not. And if they had to be in writing, then where is the writing. If there is no writing, the case is over." LMC, in its brief, correctly states: "The trial court submitted to the jury the questions whether there was such a contract and whether the contract was in writing as is required by the Statute of Frauds."

The jury was instructed on the law to be applied. All of the instructions were tendered by defendant and all of the instructions were given. In returning its verdict for plaintiff, the jury determined that there was an agreement and that it complied with the Statute of Frauds. Applying the *Pedrick* rule, there is sufficient evidence to support the verdict.

## CONCLUSION

The case was very ably presented by competent counsel for each of the parties. In final summation of the case for the jury, counsel for LMC used an appropriate analogy. He described two persons at the Art Institute observing an abstract painting. One saw a bathing beauty sunning herself while the other saw a chimpanzee scratching itself.

In analyzing the avalanche of documentary and oral evidence, the jury observed a legal work of art. By its verdict, it left no doubt as to what it saw. The fact that the trial judge did not make the same observation is no basis for disturbing the verdict.

Applying the *Pedrick* rule, we conclude that there is sufficient evidence to support the verdict of the jury for plaintiff in the sum of $1,732,669.

## II

### STATUTE OF FRAUDS
### MATTER OF FACT AND MATTER OF LAW

■ On appeal, LMC contends that the question of whether there was a written agreement within the Statute of Frauds is a matter of law. It defends the trial court's granting a judgment *n.o.v.* for LMC on the basis that the documents, as a matter of law, did not meet the requirements of the Statute of Frauds in spite of the fact that the jury determined that there was a written agreement that satisfied the statute.

The intrusion of the Statute of Frauds in this case is rather unu-

sual. Plaintiff's original complaint was based on a contract that was alleged to be partly oral and partly written. Defendant's responsive pleading denied the existence of an agreement. Extensive discovery followed. After the case had been pending for about four years and practically on the eve of the trial, defendant, for the first time, invoked the Statute of Frauds as an affirmative defense. The unreasonably long delay in asserting the Statute of Frauds raises the question of whether defendant seriously doubted the existence of such a defense or deliberately withheld its pleading until the last possible moment as a matter of trial strategy.

We need not dwell on this point, since plaintiff accepted defendant's and the trial court's challenge by filing an amended complaint which alleged a written agreement within the purview of the Statute of Frauds. The trial court insisted that the case be tried on this theory. Opening statements by both sides prepared the jury for this issue. After all of the evidence was in, the jury was instructed on the law dealing with the Statute of Frauds. All of the instructions were submitted by defendant and all were given. Both sides argued these points in their final summation to the jury. The verdict of the jury clearly establishes, as a matter of fact, that the Statute of Frauds has been satisfied.

Having failed in its initial use of the Statute of Frauds, LMC now insists that the Statute of Frauds has not been satisfied as a matter of law.

The Statute of Frauds reads in pertinent part:

> "That no action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." Ill. Rev. Stat. 1981, ch. 59, par. 1.

In this case, the Statute of Frauds, as a defense, must fail. First, the writings consisting of correspondence, minutes, memoranda and illustrative and actual "Experience for Dividend" reports which the parties exchanged, evidence the existence and the terms of the agreement and satisfy the statute. Second, full performance by ACS of its obligations under the agreement removed it from the Statute of Frauds.

A "writing" sufficient to satisfy the Statute of Frauds may be made up of several documents, which may consist of various forms such as notes, papers, letters and telegrams, so long as, taken to-

gether, they contain on their face, or by reference to other writings, the names of the parties, an identification of the subject matter of the contract, and the terms and conditions of the contract. (*Hartke v. Conn* (1981), 102 Ill. App. 3d 96, 100, 429 N.E.2d 885.) Thus, in order to meet its burden under the Statute of Frauds defense, ACS need only have shown that all of the writings that the parties exchanged, taken together, show that a contract was made and the terms of that contract. See *Mid-Town Petroleum, Inc. v. Dine* (1979), 72 Ill. App. 3d 296, 390 N.E.2d 428.

The writings in this case, taken collectively and individually, and interpreted by persons reasonably versed in insurance industry terminology, set forth the terms of the parties' agreement and sufficiently evidence the existence of and the terms of the agreement.

The meaning and impact of the agreement was enhanced and reconfirmed by the 1972 correspondence regarding the AD&D policy. Those 1972 exchanges reconfirmed in language clearly understood to a person knowledgeable in insurance terminology that two of the policies were already being underwritten on the retention and dividend basis and that the third was to be added to that basis.

All of the witnesses that testified on behalf of LMC acknowledged that LMC was obligated to return excess reserves to ACS under the formula for a period of 20 months after termination. This removes from dispute the existence of the agreement and formula. The only real dispute is whether to apply the formula for the return of excess reserves in the form of dividends for 10 years after termination or 20 months after termination. Had no agreement existed, as LMC contends, there would be no reason for returning excess reserves for any period.

By thus admitting the existence and terms of the very agreement upon which ACS bases its case, LMC has removed the Statute of Frauds defense from the case. See *Haas v. Cravatta* (1979), 71 Ill. App. 3d 325, 328-29, 389 N.E.2d 226, which holds that where the existence of a contract is admitted, the Statute of Frauds is inapplicable, because the purpose of the statute is "to prevent the fraudulent enforcement of contracts that were in fact not made."

The evidence is uncontradicted that LMC never disclosed to ACS its secret intent to cease calculations and payments 20 months after termination instead of the full 10 years specified on the face of the formula contained in written documents prepared by LMC and delivered to ACS. The only real issue in this case is not whether an agreement exists to return excess reserves after termination, but whether LMC's undisclosed intention to limit the term of that agreement to a

20-month period after termination can legally be given effect. Under basic contract law, such an undisclosed intention cannot legally be given any effect whatsoever.

Contrary to LMC's claim, this case is not one in which a party has relied on an oral agreement for a long period of time, as was the case in *Gilliland v. Allstate Insurance Co.* (1979), 69 Ill. App. 3d 630, 388 N.E.2d 68, *appeal denied* (1979), 75 Ill. 2d 590. Here, both in 1962 and 1972, ACS requested and received from LMC written confirmation of the parties' oral understandings within months.

LMC argues that ACS cannot claim to have satisfied the Statute of Frauds under the doctrine of partial performance. This argument is misplaced because LMC fails to distinguish between the doctrine of partial performance and the doctrine of full performance.

The full performance doctrine is entirely separate from the partial performance doctrine. The rationale of the full performance doctrine is that when one party, in reasonable reliance on the contract, performs all of its obligations, it would be unfair to allow the other party to accept the benefits under the contract but to avoid its reciprocal obligations by asserting the Statute of Frauds. (See *Meyer v. Logue* (1981), 100 Ill. App. 3d 1039, 1043, 427 N.E.2d 1253.) Illinois courts have uniformly followed the rule, also stated in Restatement (Second) of Contracts sec. 130 (1981), that when one party to a contract completes his performance, the one-year provision of the statute does not prevent enforcement of the promises of the other party. (*Curtis v. Sage* (1864), 35 Ill. 22; *MacDonald v. Crosby* (1901), 192 Ill. 283, 61 N.E. 505; *Mead v. Chicago & Northwestern Ry. Co.* (1914), 189 Ill. App. 323, 327.) Because ACS has fully completed its performance, LMC may not interpose the Statute of Frauds to evade its reciprocal obligation to return the excess reserves.

## III

### The Cross-Appeal

■ The trial court denied LMC's alternative motion for a new trial on all issues. In its cross-appeal, LMC contends, alternatively, that the trial court should have granted its motion because the testimony of ACS's expert witness, Theodore Kowalchuk, was improper and invaded the province of the court and jury. LMC further contends that the jury verdict was contrary to the manifest weight of the evidence.

We have previously noted that in his opening statement, counsel for LMC told the jury that both parties would call expert witnesses to

explain the documents that were written in technical insurance language. This is exactly what Kowalchuk did on behalf of ACS. LMC chose not to present any expert witness to counter Kowalchuk's testimony.

The documents received in evidence all contain language, formulas, charts, and similar technical insurance industry terminology. Because such terminology is beyond the knowledge and experience of the average juror, expert testimony was necessary and proper for the jurors to understand the terms used in the documents. (*First National Bank v. Sousanes* (1981), 96 Ill. App. 3d 1047, 1054, 422 N.E.2d 188.) The cases cited by LMC, that an expert may not testify to the meaning of terms which have "ordinary significance," do not apply to this case.

Kowalchuk did not supply any terms that were not contained in the documents admitted in evidence, nor did he use custom and usage to establish any terms that did not appear on the face of the documents. Kowalchuk merely told the jury what the terms LMC used in its documents would mean to persons knowledgeable in the group insurance field. Without some explanation, these documents and the formulas would mean little or nothing to the average juror. Kowalchuk's testimony was necessary and proper.

After reviewing the documents, Kowalchuk testified that in his opinion the documents communicated the existence of a typical association group insurance program, underwritten on a retention basis, whereby an insurer agrees to establish a given expense factor and profit margin for itself and to refund, over time, any excess reserves that are not needed to pay claims.

LMC contends that this testimony was improper because it went to the ultimate issue in the case and that, in effect, Kowalchuk was invading the province of the court and the jury. However, there is no longer any prohibition on expert testimony that goes to an "ultimate issue" in a case. (*Freeding-Skokie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 221.) As explained in Cleary and Graham:

> "An expert *** witness will not be precluded from testifying in the form of an opinion upon the ultimate issue on the ground that the testimony invades the province of the jury. While earlier decisions prohibited an opinion upon the ultimate issue [citation], recent decisions now clearly allow it. [Citations.] Since the trier of fact is not required to accept the opinion of the witness, the evidence does not usurp the province of the jury. [Citation.] *** Wigmore dismissed the common law ultimate issue rule as 'a mere bit of empty rhetoric,' 3 Wigmore, Evidence,

sec. 1920 (Chadbourn rev. 1970). ***"
E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 704.1, at 478-79 (4th ed. 1984).

The jury below had every right to accept or reject Kowalchuk's testimony that the words and format used by LMC expressed an agreement in generally accepted insurance industry terms that the insurance company would calculate and pay dividends both during the life of the program and for ten years after termination of the master policies.

It is a proper rule of expert testimony to assist the jury to understand and apply the terms of a contract. *Arnold v. Carpenter* (1967), 83 Ill. App. 2d 343, 346, 227 N.E.2d 543.

Kowalchuk's testimony that the documents evidenced an agreement was proper because he was testifying as an expert to a medium of communication which itself was beyond the knowledge of the average juror. The general rule prohibiting experts from "construing" a contract is applicable only to those cases where the document being reviewed purports to be an integrated, unambiguous contract. None of the documents here purports to be, itself, an integrated, unambiguous contract. These documents were communications in the very esoteric field of association group insurance. The expert simply told the jury what, in his opinion, they said in "insurance" language.

We have already extensively reviewed the evidence and find no support in the record to justify LMC's contention that the verdict of the jury was contrary to the manifest weight of the evidence. The trial court correctly denied LMC's alternative motion for a new trial on all issues.

CONCLUSION

The order of the trial court setting aside the verdict of the jury in favor of plaintiff ACS and entering a judgment *n.o.v.* in favor of defendant LMC is reversed, and the trial court is directed to enter judgment for plaintiff in the sum of $1,732,669, plus interest and costs. The alternative order granting defendant a new trial on the issue of damages is reversed. The order denying defendant's alternative motion for a new trial on all issues is affirmed.

Affirmed in part; reversed in part with directions.

STAMOS and HARTMAN, JJ., concur.