In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3443

COHEN DEVELOPMENT COMPANY,
an Illinois corporation,

*Plaintiff-Appellant*,

*v.*

JMJ PROPERTIES, INC.,
a Michigan corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00 C 2123—**Michael P. McCuskey**, *Judge.*

ARGUED MAY 31, 2002—DECIDED JANUARY 24, 2003

Before HARLINGTON WOOD, JR., COFFEY, and ROVNER,
*Circuit Judges.*

ROVNER, *Circuit Judge.* Cohen Development Company
("CDC") and JMJ Properties, Inc. failed to jointly acquire
a piece of property in Albertville, Minnesota, on which
they hoped to develop an outlet mall. CDC then sued JMJ,
in part, for breach of a contract that the parties allegedly
had entered into to acquire the land. Following a bench
trial, the district court held that CDC failed to prove
that the parties had entered into an enforceable agree-
ment, and entered judgment in favor of JMJ. CDC appeals,
and we affirm.

**BACKGROUND**

**1. Facts**

CDC, a family-owned business, develops, owns, and manages shopping centers and hotels. In 1994 Leslie Cohen, then Executive Vice President of CDC, identified an approximately 135-acre parcel of property along Interstate 94 in Albertville that he thought was the "last great" site in the Midwest for the development of a retail outlet mall and complementary development. In January 1995 CDC entered an Option Agreement with the property's owners, Judith and Bernard Roden, that gave CDC the exclusive opportunity to purchase the property for $733,848. The Option Agreement initially expired May 1, 1995, but gave CDC the right to extend its option in six-month intervals through November 1, 1997. After acquiring the option, CDC developed a master plan for the property under which 60 acres would be developed as an outlet shopping center and the remaining 75 acres for complimentary retail, light industrial, and warehouse use. Because, as Cohen testified at trial, CDC policy was to develop shopping centers on a nonrecourse basis, that is, without personal financial liability to CDC's principals, he was interested in finding a partner to develop the outlet portion of the property.

**A. The Parties' Original Purchase Agreement**

In September 1995 Cohen attended a semiannual convention held by Value Retail News ("VRN"), an industry trade organization for developers of outlet malls, where he was introduced to James Morse, Jr., the president of JMJ. Cohen and Morse discussed CDC's interest in "flipping" or selling 60 acres of the Roden property for the development of a retail mall while retaining the remaining 75 acres. Morse and Cohen reached a handshake deal for CDC to sell 60 acres to JMJ once it acquired the Roden

property, and on October 24, 1995, CDC and JMJ executed a Purchase Agreement memorializing their understanding. Under the Agreement, which was valid for one year, JMJ agreed to purchase from CDC 60 acres of the Roden property for $1,050,000, subject to certain contingencies, and to pay CDC earnest money of $5,000 per month during the term of the Agreement. The parties amended the Agreement in March 1996 to provide that JMJ would by July 1, 1996, designate specifically in writing the land it would purchase (that designation was necessary because at the time the Agreement was signed, CDC and JMJ had allowed the boundary of the 60 acres to "float" within the entire 135-acre parcel due to wetland mitigation issues). In August JMJ identified the parcel it would purchase.

During 1996 JMJ attempted to pre-lease space in the outlet mall (before developers begin construction on a mall, they prefer to have 50-70% of the planned store space pre-leased). Leasing progressed slowly, however, and in June and July 1996 Morse and Cohen discussed extending the Purchase Agreement so that JMJ would have extra time to market the property. At another VRN conference in the fall of 1996, Cohen presented to Morse a second amendment to extend the Purchase Agreement. Morse reviewed the draft with his attorneys but rejected it in a November 11 letter to Cohen because the changes and additions it made to the original Purchase Agreement were "too substantial to consider." Around this time Cohen also met with the Rodens to try to extend the Option Agreement beyond November 1997, but they refused. JMJ and CDC failed to agree to an extension of the Purchase Agreement, and it expired in November 1996. Although CDC and JMJ continued to negotiate after the Agreement expired, CDC also explored options with other developers to purchase the Roden property. Overtures made in January 1997 to Insignia Commercial Investments Group, for instance, proved unsuccessful.

**B. The Alleged 1997 Agreement**

In a February 1997 telephone conversation, Morse informed Cohen that the Rodens would not sign another option agreement with CDC, but he believed they would do so with JMJ. In an April 3 letter to Morse, Cohen noted that the Purchase Agreement had expired in November 1996 and stated that "you [Morse] and I have discussed the potential ways our companies . . . may now be able to reach a new agreement," but noted that "each time we sent you a written agreement, you tell me you have reconsidered the terms of our verbal understanding, have 'changed your mind', or otherwise refused to proceed." Cohen further asked Morse to "provide to [CDC] a carefully considered offer in writing, one with which you are comfortable," and stated:

> I trust you agree that time is of the essence in determining, for each of us, the future coarse [sic] of the development and ownership of this project. I think we have been most patient in the past several months in waiting for a formalized agreement, and I do not see how we can protract this process much further. Accordingly, I ask that you provide a red-line or summary of what we can later incorporate into a more formal written agreement.

On April 8 Morse responded to Cohen's letter. He explained that with CDC's cooperation he could secure a long-term option on the Roden property, and that the parties would then have what they originally agreed to:

> At this point, I believe our best course of action would be to determine how to secure a longer term option without either of us losing our previously agreed upon development interests. This can be accomplished, however, your full cooperation will be a necessity. Allow me to go make the business deal on the land and

you will have what was originally agreed to, as will we. The only difference being we have a long-term option.

Although this letter was written on JMJ letterhead and contained Morse's signature, Morse did not sign the letter himself. CDC did not introduce at trial any evidence to establish who actually signed the letter, although Cohen testified that he believed it was signed by Morse's secretary.

On May 6, Cohen responded to Morse's letter, stating that "we have agreed to accept your [April 8, 1997] offer." He also summarized his understanding of the deal, which was that CDC would allow JMJ to reach an agreement with the Rodens to purchase their property, and JMJ would then transfer 75 acres and $225,000 to CDC:

It is our understanding that we will allow you to make the business deal on the property, as you proposed. In so doing, you and I will each end up with the respective interests previously agreed upon, as follows: immediately upon your purchase of the property, you will retain sixty acres for your retail development and will then convey, or cause to be conveyed to us, to us [sic] the residual seventy five acres along with a $225,000 net cash profit.

Cohen testified at trial that in a subsequent telephone conversation, Morse assured Cohen that they would proceed according to the understanding outlined in Cohen's May 6 letter. After Cohen's May 6 letter, CDC refrained from contacting the Rodens to either exercise or extend its Option, though it did discuss the Roden property with other developers and investors in case the agreement with JMJ fell through.

### C. Further Discussions Between JMJ and CDC in Fall 1997

In September 1997 Morse informed Cohen that JMJ and the Rodens had agreed to a two-year option agreement for the Roden property, under which JMJ would pay the Rodens $20,000 per year earnest money for the right to purchase the property for $900,000. Morse also told Cohen that he believed that JMJ owed CDC $225,000 (the net profit CDC would have realized if JMJ had purchased the 60 acres for $1,050,000 as contemplated under the parties' original Purchase Agreement) and that he wanted to put a formal agreement together to accommodate a transaction between JMJ and CDC. In October Morse faxed a letter to Cohen stating that if all went well, he would execute the option agreement with the Rodens by October 10, 1997. He further stated that "of course, simultaneous to this, you and I must execute an agreement whereby you will receive from me 75± acres of the 135± acres for $1.00." Morse enclosed a draft agreement for Cohen's review, noting that JMJ and CDC had entered into the October 1995 Purchase Agreement on the basis of the Option Agreement held by CDC to purchase the Roden property and that CDC's Option Agreement was due to expire on November 1, 1997. It further stated that CDC and JMJ had "agreed to certain changes in their prior relationship and certain revisions to their mutual undertakings" and provided the following terms: 1) CDC would not seek to renew, extend, or revise its Option Agreement with the Rodens; 2) JMJ would exert its best efforts to obtain a new two-year option agreement from the Rodens, and CDC would transfer its right, title, and interest in its 1995 Option Agreement to JMJ; 3) JMJ would waive its right to seek specific performance of the 1995 Purchase Agreement as long as CDC did not default on any of its terms; and 4) if JMJ successfully exercised an option agreement with the Rodens and acquired

the 135 acres of property, it would transfer 75 acres of the property to CDC for $1.00.

On October 24, 1997, Cohen wrote Morse back, stating that CDC "accept[s] the new agreement for [the Roden property] which you sent to me." Cohen did not, however, sign and return the proposed agreement—rather, he told Morse that "[t]here remains some minor 'clean-up' language and exhibits which our counsel will provide in a follow-up letter next week, all of which will assist your final revision of our Agreement for immediate signature." CDC's attorneys sent various suggested revisions to Morse, but no finalized agreement was ever signed by both JMJ and CDC. On October 31, Cohen sent a letter to the Rodens advising them that CDC would not exercise its Option to purchase their land; CDC's Option expired the following day. On November 5, JMJ entered into an option agreement with the Rodens to purchase an approximately 105-acre portion of their land for $850,000. JMJ exercised the option in April 1999. It did not sell any of the land to CDC, but instead developed an outlet mall on the property without CDC's involvement.

**2. District Court Proceedings**

In December 1999 CDC (an Illinois corporation) filed this diversity suit against JMJ (a Michigan corporation), Morse (a Michigan citizen), and the Rodens (Minnesota citizens, who were subsequently dismissed) seeking a declaratory judgment setting forth the parties' rights to the Rodens' land and asserting that JMJ and Morse had committed fraud against CDC, breached fiduciary duties they owed to CDC, and tortiously interfered with CDC's

business relationships.[1] Morse passed away during the pendency of the suit. In June 2000 CDC amended its complaint against JMJ and Morse's estate (which was later voluntarily dismissed), substituting a breach of contract claim for the declaratory judgment action.

The district court held a bench trial in November 2000 and granted judgment in favor of JMJ in August 2001. At trial CDC argued that the exchange of letters between itself and JMJ on April 8 and May 6, 1997, evidenced a valid contract between the parties. JMJ argued that the parties had not reached an agreement and that the letters did not meet the requirements of the Illinois Frauds Act, 740 ILCS 80/2. The district court agreed with JMJ, finding that there was no "final, enforceable written agreement between [CDC and JMJ that] satisfies the Frauds Act." The court concluded that even if the exchange of letters in Spring 1997 did establish a valid written contract between the parties, the agreement it contained was no longer recognized as effective by the parties in September 1997. In reaching this conclusion, the court relied upon the communications between Cohen and Morse in September in which both acknowledged the need to enter a formal agreement regarding the Roden property; the court found that these communications reflected that neither JMJ nor CDC "believed they had a finalized agreement at that time." Thus, the court found, the evidence showed that JMJ did not intend to be bound by the Spring 1997 exchange of letters. The court addi-

---

[1] The parties and the district court applied Illinois law in analyzing CDC's claims, and both parties have argued Illinois law on appeal. We therefore also apply Illinois law in our analysis. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 n.2 (7th Cir. 2002); *Brunswick Leasing Corp. v. Wisconsin Central, Ltd.*, 136 F.3d 521, 525-26 (7th Cir. 1998).

tionally concluded that the parties did not reach such a formal agreement because Cohen never signed the draft sent by Morse but rather proposed "substantive" changes to it that were not agreed to by JMJ. Thus, CDC's breach of contract claim was barred by the statute of frauds.

The court also rejected CDC's argument that the statute of frauds was inapplicable because CDC had fully performed the alleged Spring 1997 agreement by not contacting the Rodens either to extend the Option Agreement or to exercise its Option to purchase the property. The court found that any performance by CDC was "completely illusory" because CDC had continued to pursue a purchase of the property independent of JMJ and had not contacted the Rodens for reasons other than its supposed agreement with JMJ.

## DISCUSSION

CDC argues that the district court erred in concluding that its breach of contract claim was prohibited by the Illinois statute of frauds. It asserts that the district court wrongly determined that no enforceable written contract that complied with the statute of frauds existed between the parties and, in any event, that the statute of frauds did not apply to the agreement between the parties. Because the district court rendered judgment after a bench trial, we review its legal conclusions *de novo* and its findings of fact and its application of facts to law for clear error. *See* Fed. R. Civ. P. 52(a); *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). A finding is clearly erroneous only when this court "is left with a definite and firm conviction that a mistake has been committed." *Bowles v. Quantam Chemical Co.*, 266 F.3d 622, 630 (7th Cir. 2001) (citations omitted).

**1.  Existence of Enforceable Contract**

**A.  Intent to Enter Contract**

CDC first contends that the district court erroneously concluded that no enforceable contract existed between itself and JMJ. It asserts that the exchange of letters in April and May 1997[2] manifested the parties' intent to form a binding agreement and that the court improperly determined that the parties' subsequent negotiations in September 1997 to enter a more formal agreement negated that agreement as a matter of law. Whether CDC and JMJ intended to enter into a contract is a factual issue which we review for clear error. *Ginsu Prods., Inc. v. Dart Indus., Inc.*, 786 F.2d 260, 262 (7th Cir. 1986); *see also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990); *Bay Area Typographical Union, Union No. 21 v. Alameda Newspapers, Inc.*, 900 F.2d 197, 199 (9th Cir. 1990). To determine whether the parties intended to be bound by the alleged contract, we look not to the parties' subjective intent but rather to objective evidence of their intent. *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989). When parties make a pact "subject to" the execution of a later agreement, they manifest an intent not to be bound by the original pact. *Id.*; *see also Chicago Inv. Corp. v. Dolins*, 481 N.E.2d 712, 715 (Ill. 1985).

---

[2] In its brief, JMJ argues that the April 8 and May 6 letters were not admitted into evidence by the district court and should not be considered on appeal because they are inadmissible hearsay. The district court in fact declined to rule on their admissibility because "even considering [them], CDC has not shown the existence of a written contract binding on JMJ." We too need not address the admissibility of these documents because even taking them into account CDC fails to show that the district court committed any error in its decision.

The evidence presented at trial supports the district court's factual determination that CDC and JMJ did not intend to be bound by the Spring 1997 exchange of letters. First, it is not clear that Morse intended his April 8 letter to constitute an offer to Cohen to enter a contract. In the letter Morse suggested that Cohen "allow me to go make the business deal on the land and [CDC] will have what was originally agreed to, as will [JMJ]." CDC's assertion that this statement constituted a "specific offer" reads more into Morse's words than is reasonable. Morse prefaced the "offer" with language more indicative of a willingness to bargain than an invitation to contract, stating that "I believe our best course of action would be to determine how to secure a longer term option without either of us losing our previously agreed upon development interests." Furthermore, his "offer" was vague, failing to set forth any specific obligations the parties would undertake, and was qualified by language more consistent with an invitation to bargain than an offer to enter a contract. Rather than asking Cohen to indicate whether he accepted the terms of the "offer," Morse's letter stated, "Les, the ball is in your court" and "[p]lease give me a call at your earliest convenience," indicating that further discussion was necessary. Cohen thus failed to establish that Morse's April 8 letter constituted an offer to contract.

Additionally, the exchange of documents reflects that both JMJ and CDC intended to enter a formal agreement setting forth their relationship and respective obligations with respect to purchasing the Roden property. Before Morse made his April 8 "offer" to Cohen, Cohen in an April 3 letter had expressed impatience waiting for the parties to enter a "formalized agreement" and had invited Morse to provide "a red-line or summary of what we can later incorporate into a more formal written agreement." Furthermore, although Cohen in his May 6 letter purported to accept Morse's "offer," the parties continued to

negotiate the terms of a formal agreement until CDC's Option expired, further indicating that they had not reached an agreement in, or intended to be bound by, the Spring 1997 letters. In light of this evidence, we cannot say that the district court clearly erred in finding that JMJ and CDC did not intend for the exchange of letters to form a binding written contract.

Because we agree with the district court's finding that CDC and JMJ did not intend to enter a binding agreement via their exchange of letters, we need not consider CDC's argument that subsequent negotiations did not render that agreement void.

### B. Conformity with the Statute of Frauds

CDC also argues that the district court erroneously concluded that its purported agreement with JMJ did not conform with the Illinois statute of frauds. It asserts that even though there was "no single document that was signed by both parties agreeing to the terms and conditions," the Spring 1997 exchange of letters sufficiently enumerated the basic terms of the parties' agreement. The Illinois statute of frauds provides that actions regarding a sale of land are barred unless the land sale agreement is memorialized in writing:

> No action shall be brought to charge any person upon any contract for the sale of lands . . . unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party.

740 ILCS 80/2. The writing required by the statute need not itself be a valid contract, but only evidence of one. *Crawley v. Hathaway*, 721 N.E.2d 1208, 1211 (Ill. App. Ct. 1999) (quoting *Melrose Park Nat'l Bank v. Carr*, 618

N.E.2d 839, 843 (Ill. App. Ct. 1993)). To satisfy the statute of frauds, however, a written memorandum must contain on its face the names of the vendor and vendee, a description of the property sufficient to define it as the subject matter of the contract, the price and other terms and conditions of the sale, and the signature of the party to be charged. *Crawley*, 721 N.E.2d at 1210 (quoting *Callaghan v. Miller*, 162 N.E.2d 422, 424 (Ill. 1959)). A writing can satisfy the statute even if it is made up of several documents, such as notes, papers, or letters as long as, taken together, they contain the required information either on their face or by reference to other writings. *American Coll. of Surgeons v. Lumbermens Mut. Cas. Co.*, 491 N.E.2d 1179, 1192 (Ill. App. Ct. 1986).

Even if CDC and JMJ had manifested an intent to be bound by the Spring 1997 exchange of letters, those letters did not meet the mandates of the statute of frauds. Most notably, CDC presented no evidence that either of the letters was signed by an authorized agent of JMJ, the party to be charged under the contract. *See Prodromos v. Poulos*, 560 N.E.2d 942, 946 (Ill. App. Ct. 1990). It is undisputed that Morse, JMJ's president, did not sign the April 8 letter that JMJ sent to Cohen. Although Cohen testified at trial that the signature "appears to be the signature of [Morse's] secretary," he could not definitively identify who had signed the document. But even if the letter had been signed by Morse's secretary, CDC presented no evidence that she had written authority to sign an agreement with CDC. *See Leekha v. Wentcher*, 586 N.E.2d 557, 560 (Ill. App. Ct. 1991) (agent must have written authority to sign contract for sale of land) (quoting *Prodromos*, 560 N.E.2d at 946); *Schoenberger v. Chicago Transit Auth.*, 405 N.E.2d 1076, 1080 (Ill. App. Ct. 1980) (person alleging agent's authority must prove source of that authority). Additionally, there is no evidence that Morse ratified his secretary's action with a signed docu-

ment referencing the May 8 letter. *Prodromos*, 560 N.E.2d at 946. The April and May exchange of letters, therefore, did not comply with the Illinois statute of frauds and did not form an enforceable contract, and the district court did not err in so finding.

## 2. Applicability of the Statute of Frauds

CDC also argues, albeit in somewhat cursory fashion, that the statute of frauds did not apply to the agreement between the parties because it fully performed its obligations under the contract. CDC asserts that it fully performed because, in accordance with its agreement with JMJ, it neither contacted the Rodens to seek an extension of its Option Agreement nor exercised the Option even though it had the financial ability to do so. The district court rejected CDC's argument, finding that any performance on its part pursuant to the contract was "completely illusory" because its forbearance from contacting the Rodens was induced by forces independent of the contract and because CDC had never intended to use its own money to exercise the option.

Even if we were to assume that the parties had manifested an intent to contract, we find no error with the district court's conclusion that CDC did not fully perform its obligations. Although the Illinois statue of frauds does not apply to bar enforcement of a contract that has been completely performed by one party, *B and B Land Acquisition, Inc. v. Mandell*, 714 N.E.2d 58, 62 (Ill. App. Ct. 1999), that party's performance must be done "in reliance upon the agreement." *Thilman & Co. v. Esposito*, 408 N.E.2d 1014, 1021 (Ill. App. Ct. 1980); *see also Anastaplo v. Radford*, 153 N.E.2d 37, 43 (Ill. 1958); *Kane v. Hudson*, 112 N.E. 683, 684-85 (Ill. 1916) ("It is indispensable that the acts done in performance of the contract shall be referable to the contract alone, and to have

been done in performance of it."). The evidence adduced at trial supports the district court's finding that CDC's alleged performance under the terms of the contract was illusory. Although CDC did not contact the Rodens to obtain an extension of its Option after the April and May 1997 exchange of letters with JMJ, the evidence shows that its forbearance was not motivated solely by the alleged contract. Cohen testified at trial that he knew as early as January 1997 that the Rodens would not extend the Option with CDC, and that in February he knew that the Rodens "would not under any circumstances extend its option with" CDC. Thus, Cohen was aware even before the Spring 1997 exchange of letters that any attempt to contact the Rodens to extend the Option would be futile. Under these circumstances, the district court did not err in finding that CDC's failure to contact the Rodens after May 1997 was not based solely on the contract and constituted illusory performance.

Similarly, we find no error with the court's conclusion that CDC's failure to exercise its option after the Spring 1997 exchange of letters was not motivated solely by the purported contract. As the court noted, CDC continued to pursue ways to exercise its Option even after agreeing to let Morse make a deal with the Rodens. For example, although Cohen testified at trial that CDC had the financial ability to exercise the Option if it wanted to, the record also supports a finding that CDC did not find an acceptable way to finance the property. Although Cohen explored obtaining a mortgage from Best Choice Mortgage of Minneapolis, he testified at trial that he ultimately did not pursue the mortgage because it would not have allowed him to proceed "in a manner that was acceptable to the company at the time." From this evidence the district court could reasonably have determined that CDC's failure to contact the Rodens or exercise its Option was not based on its alleged contractual promise to JMJ and

constituted merely illusory performance. Accordingly we find no error with the district court's conclusion that CDC did not perform all of its obligations under the contract and that the statute of frauds barred CDC's breach of contract claim.

## CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*