12 June 2000

NO. 5-98-0769

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

JOHN O. SCHOFIELD, INC., )  Appeal from the  

)  Circuit Court of

     Plaintiff-Appellant and Cross-Appellee, )  Wayne County.

)  

and )

)

W. S. HOWARD, )

)

     Plaintiff, )

)

v. )  No. 93-L-3

)

SAM H. NIKKEL, )

)

     Defendant-Appellee and Cross-Appellant, )

)

and )

)

FARM BUREAU OIL COMPANY, )

)

     Defendant-Appellee, )

)

and )

)

H. WAYNE GIFFORD and MINERAL )

DEVELOPMENT, INC., )  Honorable

)  Larry O. Baker,

     Defendants. )  Judge, presiding.

________________________________________________________________________

JUSTICE HOPKINS delivered the opinion of the court:

The plaintiff, John O. Schofield, Inc. (Schofield), is Stephen Wilson's assignee and successor in interest.  Schofield claims that defendant Sam H. Nikkel orally agreed to convey to Wilson an interest in all oil and gas leases acquired in an area known as the Boulder Field Unit (Boulder Field) in exchange for Wilson's geological services.  Nikkel maintains that he agreed to convey to Wilson only an interest in the portion of Boulder Field known as lease A, the lease promoted by Nikkel. 

Schofield appeals the trial court's judgment denying its claim for specific performance of the oral agreement.  Schofield asks this court to reverse the trial court's ruling that Schofield's acceptance of proceeds of oil produced by lease A of Boulder Field bars Schofield's claim of interest in lease B by either estoppel or ratification.  Schofield requests this court to award it 1/64 of 75% carried working interest in lease B, in addition to a judgment in the amount Schofield would have earned on the interest in lease B had Nikkel conveyed it to Wilson.  Nikkel cross-appeals, asserting that the trial court erred in finding an enforceable oral agreement between Nikkel and Wilson and in finding that the Department of Mines and Minerals' unitization order did not bar the collateral attack in the trial court through the doctrine of 
res judicata
 or collateral estoppel.  Defendant H. Wayne Gifford has been dismissed from both the appeal and the cross-appeal.  Plaintiff W.S. Howard is also not a party to this appeal or cross-appeal.

We affirm the trial court's judgment in favor of Nikkel for reasons other than those relied on by the trial court.

FACTS

John Prior, an independent oil and gas producer and an oil field drilling and construction contractor, acquired from the Bureau of Land Management in 1987  an oil and gas lease, known as lease A in Boulder Field, covering portions of the Carlyle Lake Recreation Area.

Testimony of oral agreement

Wilson, a petroleum geologist, testified that in late 1986 and early 1987, he provided Nikkel, who was in the business of acquiring oil and gas leases for third parties, with Illinois Geological Survey 102, which included information pertinent to Boulder Field.  After his meeting with Wilson, Nikkel learned that Prior had acquired lease A of Boulder Field.  Nikkel met with Prior, and in June 1987, Prior assigned his interest in lease A to Nikkel.  In a letter of agreement, Prior and Nikkel acknowledged that not only would Nikkel acquire lease A from Prior, but he would also have the opportunity to acquire future interests within Nikkel's and Prior's area of mutual interest, which covered four sections in the area of  Boulder Field. 

Wilson testified that after Nikkel returned to Wilson, Nikkel seemed confident he could acquire the leases from Prior.  Wilson then provided Nikkel with scout check tickets, production information, a copy of a Illinois State Geological Survey publication, a computer-

generated map, and one or two electric logs.  Wilson stated that he and his assistant each spent approximately 80 hours exerting effort with respect to Boulder Field.  Wilson testified that at that time, he and his assistant each charged $25 an hour.  

Wilson testified he had a clear understanding that Nikkel agreed to give Wilson a 1/32 overriding royalty interest in the entire Boulder Field in exchange for Wilson's services.  Wilson explained that he later agreed with Nikkel to reclassify his interest in Boulder Field from a 1/32 overriding royalty interest to a 1/64 of 75% carried working interest.  An overriding royalty interest is not subject to any costs or expenses, whereas a carried working interest, as interpreted by the parties herein, is subject to its proportionate share of operating expenses but is not subject to costs of drilling and completing.

Wilson testified that, as a petroleum geologist who provided information on specific drilling prospects, he always received an interest in all of the wells drilled and in all of the leases acquired in the entire prospect area and that his agreements were almost always oral.  Wilson also testified that he believed that if the area were to be unitized, he would receive his 1/64 x 75% carried working interest in the entire Boulder Field. 

At trial, Nikkel testified that he never undertook to acquire any leases for Wilson on contract wells or other projects.  Nikkel testified that the only information that Wilson provided on Boulder Field was Illinois Geological Survey Bulletin 102, a known geological survey.  Nikkel testified that he conversed later with Wilson, mentioning to Wilson that he was interested in arranging a deal, but Wilson appeared uninterested.  Nikkel testified, however, that Wilson subsequently provided to Nikkel a computer-generated map, one or two scout tickets, and one or two electric logs, all of which were unsolicited and were not used in Nikkel's presentations because Nikkel provided his own maps and selling exhibits to promote the well on lease A of Boulder Field.  Nikkel admitted that he intended to compensate Wilson for showing Nikkel the Illinois Geological Survey Bulletin.  Nikkel testified that the information Wilson provided to him from Illinois Geological Survey Bulletin 102 encompassed an area that includes what is now known as lease A and lease B of Boulder Field.  

In November 1987, the government canceled approximately 121.04 acres in lease A that had been leased to Prior.  Nikkel testified that after he raised the funds to do the initial drilling and obtained production on the first well on lease A of Boulder Field, Nikkel gave Wilson, in January 1988, a partial assignment of oil and gas lease, which Nikkel intended to be a 1/64 of 75% carried working interest in lease A.  The written assignment from Nikkel to Wilson was executed in January 1988 and conveyed a 1.5625% carried working interest in the real estate originally acquired by Prior in lease A, minus the 121.04 acres retracted in 1987. 

Additional acreage covering Boulder Field was nominated for lease by the Bureau of Land Management in December 1988.  Effective January 1, 1989, Prior acquired the second lease from the United States government, now known as lease B in Boulder Field.  Although the 1987 agreement between Nikkel and Prior required Prior to assign lease B to Nikkel, on November 1, 1992, Prior assigned lease B to Gifford to commence operations.

Lease A thus became the amount of acreage that was initially obtained from the Bureau of Land Management by John Prior, less the 121.04 acres retracted from him, and lease B became that acreage acquired in the second transaction between Prior and the Bureau of Land Management in January 1989.

Wilson testified that in 1989 he refused to pay lease acquisition and leasehold costs on the balance of the ground in Boulder Field.  Jack Alexander, from J & F Energy, as the operator of lease B, testified at trial that had Wilson paid the $1,000 due for lease acquisition costs on lease B, then Wilson would have been credited with his proportionate share of lease B.  As a result of Wilson's refusal, the operators told Wilson he would be forfeiting his interest in lease B.

Wilson received $2,000 to $3,000 in proceeds from his interest in lease A of Boulder Field from January 1988, the date of Nikkel's assignment to Wilson, until March 1991. Wilson, in March 1991, assigned his interest, which he believed to be a 1/64 of 75% carried working interest in the entire Boulder Field, to Schofield for $9,500.  Although the assignment purportedly conveyed lease A and lease B of Boulder Field, Wilson did not "warrant title to the aforedescribed leases of lands."

Expert testimony of custom and usage

The geology experts at trial, Marshall Daniel and John Basnett, testified that generating a prospect involves developing an idea to find oil and gas by using skills and available geological data to interpret and generate geological maps, scout tickets, different well information, production information, and any other available information.  The experts testified that operators often compensate the geologist with a generation fee of an overriding royalty interest in the prospect generated, along with an hourly compensation for watching the well, and that these agreements are generally oral.  The experts testified that the custom and usage in the Illinois oil and gas industry regarding a geologist who generates a prospect in exchange for acquiring an interest is that the geologist receives an overriding royalty interest, or other agreed-upon interest, in all wells within the prospect area or area of mutual interest, which may encompass more than one lease and which may expand as the prospect develops.  One of the experts testified, however, that had he generated the underlying prospect, he would have performed additional work, including making additional maps, bringing the data up-to-date, and showing the operator his ideas and giving him reasons why the particular prospect would be a viable place to explore.

Unitization proceeding of Department of Mines and Minerals

In January 1992, Nikkel and Gifford, the respective owners/operators of lease A and B of Boulder Field, filed a petition with the Illinois Department of Mines and Minerals (the Department) to unitize the leases pursuant to statute.  See 225 ILCS 725/23.1 through 23.16 (West 1998).  Unitization is a method of combining separate leases to allow for the operation of the field as a single unit.  The proceeds of the unit are then distributed proportionately to the owners according to their interest as fixed by a final order of the Department in the unitization proceeding.  

The unitization petition set forth the owners of interest in leases A and B.  Schofield was listed as having a 1.5625 carried working interest in lease A and no interest in lease B.  The petition indicated that consistent with the operating agreement, Schofield, as assignee of Wilson, could acquire an interest in lease B upon payment of its proportionate share of the drilling costs in lease B.  Similarly to Wilson, Schofield refused the offer, claiming an ownership interest in lease B by virtue of its assignment from Wilson.  John O. Schofield testified at trial, however, that he knew that Wilson never received an assignment of an interest in lease B. 

Pursuant to statute, Schofield, as an interest owner of Boulder Field, received notice of the unitization proceeding and filed an objection with the Department.  Schofield's objection to the unitization proceeding was that the proposed plan for unitization failed to recognize Schofield's claimed interest in lease B.  Schofield presented its objections to the unitization petition through a representative before the hearing officer of the Department  on March 30, 1992, which representative, as John O. Schofield testified at trial, was aware of Schofield's objections that it was not recognized as an interest owner in lease B.  

The unitization board listed six issues on which it based its decision to unitize, which are extracted from statutory authority:

"(1) That unitized management and operation is economically feasible and reasonably necessary to increase the ultimate recovery of oil and gas, to prevent waste, and to protect correlative rights, and

the value of the estimated ultimate additional recovery of oil and gas will exceed the estimated additional cost, if any, incident to conducting the unit operation, and

the ariel extent of the pool or pools, or parts thereof, has been reasonably defined and determined by drilling operations, and the unitization and operation of such will have no substantially adverse effect upon the remainder of the pool or pools, or parts thereof, and

the allocation of unit production to each separately owned tract is fair, reasonable, and equitable to all owners of oil and gas rights in the unit area, and

the determination and allocation of unit expense is fair, reasonable[,] and equitable to the working interest owners, and

the compensation or adjustment for wells, equipment, and other properties of the working interest owners is fair, reasonable, and equitable."

See 225 ILCS 725/23.5 (West 1998).

The hearing officer stated that the above criteria were "essentially *** the scope of [the] proceeding."  During the hearing concerning unitization, Gifford presented evidence supporting ownership by providing assignments and other ownership documentation.  Howard argued at the unitization proceeding that the carried working interest owners in lease A were to be carried in lease B because all of the acreage in Boulder Field had not been included in the first lease.  Howard also asserted that while some interest owners of lease A were extended an interest in lease B, others were arbitrarily excluded.  Gifford and Nikkel countered that those interest owners who failed to pay their proportionate share of acquisition costs of lease B, according to the operating agreement, were excluded from lease B.  

The Department entered an interim order of unitization on April 21, 1992, and a final unitization order on July 1, 1992, approving the plan as submitted.  The final order limited Schofield's interest in Boulder Field to lease A.  Schofield never filed a petition for reconsideration or an appeal of the Department's administrative decision.  The operation of the unit, the distribution for the oil proceeds, and the proportioning of the expenses thereafter was based upon the final order of the Department.

Farm Bureau Oil Company (Farm Bureau), the crude oil buyer for Boulder Field, executed division orders based upon the final unitization order of the Department and distributed the proceeds of the unit, recognizing Schofield's interest only in lease A.  Schofield executed the division order from Farm Bureau; however, on April 26, 1993, Schofield typed the following on the division order sent to it by Farm Bureau:

"By execution of this division order, John O. Schofield, Inc., requests payment of the described interest; however, execution of this division order indicating that John O. Schofield claims an additional interest in the Boulder Field Unit, the total interest claimed by John O. Schofield, Inc., in the Boulder Field Unit is .015625 carried working interest.  Execution of this division order in no way waives claims of carried working interest of John O. Schofield, Inc."  

John O. Schofield explained at trial that his company has received approximately $10,000 in proceeds from its interest in lease A.  The present fair market value of Schofield's interest in lease A, to which John O. Schofield also testified at trial, is approximately $402,575. 

Circuit court judgment

Following a bench trial, the trial court entered final judgment in favor of Nikkel on July 28, 1998.  The trial court held, in pertinent part, that the Department's previous decision  did not bar Nikkel's collateral claim in the trial court either by the doctrine of 
res judicata
 or collateral estoppel; that Nikkel and Wilson entered into an enforceable oral contract, not barred by the statute of frauds, conveying from Nikkel to Wilson a 1/64 of 75% carried working interest in both lease A and lease B of Boulder Field; and that Schofield's acceptance of benefits under the Department's unitization agreement constituted a ratification of unitization and estopped him from claiming an additional interest in lease B. 

Schofield, Nikkel, and Gifford filed posttrial motions, and after hearing arguments, the trial court, on October 26, 1998, denied each posttrial motion.  On November 24, 1998, Schofield filed its timely appeal, and on November 30, 1998, Nikkel and Gifford filed their timely cross-appeals.

ANALYSIS

Res judicata

Nikkel argues that Schofield is barred, by 
res judicata
 or collateral estoppel, from asserting a claim to an interest in lease B because the Department's final unitization order previously found that Schofield had no interest in lease B.  Because Schofield failed to appeal that order, Nikkel argues that Schofield cannot now collaterally attack the order by relitigating the issue in the trial court.  Nikkel asserts that the trial court erroneously concluded that the Department lacked the statutory authority to determine Schofield's ownership interest in the unit.

Schofield agrees that the Department's final decisions are subject to review under the Administrative Review Law or the decisions cannot be challenged.  However, Schofield asserts that the decision made by the Department allowed unitization and established participation factors for the two leases but did not determine whether Schofield was entitled to a carried working interest in lease B and that therefore the decision of the unitization proceeding did not dispose of the underlying litigation.

The doctrine of 
res judicata
 provides that a final judgment by a court of competent jurisdiction on the merits is conclusive of the rights of the parties and is a bar to a subsequent action for the same claim.  See 
Housing Authority for La Salle County v. Young Men's Christian Ass'n
, 101 Ill. 2d 246, 251 (1984); 
Rhodes v. St. Charles Manufacturing Co.
, 149 Ill. App. 3d 821, 823 (1986).  The doctrine was judicially created to protect litigants from the burden of retrying the same issue with the same party and to assist judicial economy by prohibiting successive litigations.  See 
Rhodes
, 149 Ill. App. 3d at 823.  Once 
res judicata
 is established to prevent the prosecution of a second action between the same parties upon the same claim, it is conclusive not only to matters offered to sustain the claim, but as to any other matter that might have been offered for that purpose.  See 
Housing Authority for La Salle County
, 101 Ill. 2d at 251-52.  The doctrine of 
res judicata
 therefore extends not only to what was actually decided in the original action but also to matters that could have been determined in the prior suit.  See 
Rein v. David A. Noyes & Co.
, 172 Ill. 2d 325, 334 (1996).

A party must exhaust its administrative review remedies before seeking equitable relief, and a party cannot collaterally attack an agency order unless the order is void on its face because it is unauthorized by statute.  See 
Newkirk v. Bigard
, 109 Ill. 2d 28, 35 (1985).  The doctrine of 
res judicata
 applies to decisions of administrative agencies where the issues and parties are identical (see 
Rhodes
, 149 Ill. App. 3d at 823) and where there is a final judgment on the merits rendered by a court of competent jurisdiction (see 
Rein
, 172 Ill. 2d at 335).

Schofield did not file a petition for reconsideration or an appeal of the administrative decision of the Department, although the Code of Civil Procedure provides for such appeals under the Administrative Review Law.  See 225 ILCS 725/10 (West 1998); 735 ILCS 5/3-

101 
et seq.
 (West 1998).  In the unitization proceeding, both the plaintiffs and the defendants, or their privies in the underlying action in the circuit court, were given notice of the Department's unitization proceeding and were represented at the hearing, including, among others,  Howard, Prior, Gifford, Nikkel, and Schofield, through its representative, Jim Payne.

We find that the cause of action in the case 
sub judice
 mirrors the cause of action before the Department.  To determine whether causes of action are the same for 
res judicata
 purposes, Illinois courts have adopted two tests, the same-evidence test and the transaction approach.  See 
Rodgers v. St. Mary's Hospital
, 149 Ill. 2d 302, 312 (1992).  Under the same-

evidence test, 
res judicata
 bars the second suit if the evidence needed to sustain the second suit would have sustained the first or if the same facts were essential to maintain both actions.  See 
Rodgers
, 149 Ill. 2d at 312.  Under the transaction approach, 
res judicata
 bars the second suit if both suits arise from the same transaction, incident, or factual situation and provides that the assertion of different theories of relief still constitutes a single cause of action if a single group of operative facts gives rise to the assertion of relief.  See 
Rodgers
, 149 Ill. 2d at 312.

In 
Rhodes
, the court concluded that the decision of the Industrial Commission, finding the plaintiff's medical services to be unnecessary and thus not compensable under the Workers' Compensation Act, controlled the issue between the parties in the case before the court, where the plaintiff relied on a medical benefits contract also excluding compensation for unnecessary services.  See 
Rhodes
, 149 Ill. App. 3d at 823.  
Res judicata
 applied, barring the second action.  See 
Rhodes
, 149 Ill. App. 3d at 823.

In the present case, the underlying cause of action in the trial court involved one disputed claim of interest in the property, while the proceeding before the Department questioned whether the allocation of the unit was fair to all the owners of the oil and gas rights.  Schofield concedes it was represented at the first proceeding of the Department by Jim Payne, a petroleum engineer.  Schofield asserts, however, that the questions raised by its representative concerned the technicalities and petroleum engineering factors involved in determining whether lease A and lease B should be unitized.  Schofield asserts that a review of the questions discussed before the Department discloses that the subject matter was all technical data relative to the production of oil from the proposed unit and relative to the allocation of the production to particular tracts.

The record indicates that Schofield wrote to the Department prior to the hearing, asserting its interest in lease B of Boulder Field.  In addition, John O. Schofield testified at trial that Schofield's representative was aware of the situation concerning the ownership dispute when he attended the hearing.  During the hearing, Gifford presented evidence supporting ownership by providing assignments and other ownership documentation. Howard argued at the unitization proceeding that the carried working interest owners in lease A were to be carried in lease B because all of the acreage in Boulder Field had not been included in the first lease.  Howard also asserted that while some interest owners of lease A were extended an interest in lease B, others were arbitrarily excluded.  Gifford and Nikkel countered at the hearing that those interest owners who failed to pay their proportionate share of acquisition costs of lease B, according to the operating agreement, were excluded from lease B.

The evidence to sustain Schofield's objection in the Department hearing to show its interest in lease B would have been the same offered at the trial court, 
i.e.
, the evidence of the oral agreement between Wilson and Nikkel, custom and usage, and the pertinent assignments.  Further, Schofield objected to its lack of ownership in lease B in the unitization proceeding, inherently relying on the same transaction and single group of operative facts to assert its interest–the transaction between Wilson and Nikkel and the subsequent assignments of interest.  Although these assertions were not fully discussed before the hearing officer of the Department, they were the basis of Schofield's objection to the unitization, and Schofield had an obligation to present its claim in that proceeding.  Failing to do so, it was barred by the doctrine of 
res judicata
 from collaterally attacking the Department's determination at the trial court.

We further find that the Department, an arbiter of competent jurisdiction with sufficient statutory authority, rendered a final judgment on the merits of whether Schofield owned an interest in lease B.  In 
Newkirk
, 109 Ill. 2d at 31, the court held that because the mining board had personal jurisdiction, subject matter jurisdiction, and the inherent statutory authority to issue the order, its authority was not lost because the order was defective or because the plaintiff failed to attend personally or through counsel, since the plaintiff was given advance notice of the hearing.

In 
Marco v. Doherty
, 276 Ill. App. 3d 121, 122 (1995), the court held that the plaintiff, who failed to appeal the director of employment security's final decision, following an adjudicatory administrative hearing, concerning the same factual issue before the circuit court, was prohibited from bringing a second action before the circuit court.  The court in 
Marco
 noted, "In Illinois, administrative decisions have 
res judicata
 and collateral estoppel effect where a department's determination is made in proceedings that are adjudicatory, judicial, or quasi-judicial in nature.  [Citation.]"  
Marco
, 276 Ill. App. 3d at 122.  

We have found that the hearing officer of the Department, an arbiter of competent jurisdiction and sufficient statutory authority, rendered a final judgment on the merits of whether Schofield owned an interest in lease B.  The Department had competent jurisdiction to render a final judgment concerning the merits of Schofield's claim of ownership in lease B because it gave proper notice to Schofield pursuant to statute, Schofield objected to the unitization asserting its ownership in lease B, and Schofield was represented at the unitization proceeding by Jim Payne, who, as John O. Schofield testified at trial, was apprized of Schofield's claim of ownership in lease B of Boulder Field.  

Further, the Department's authority to determine ownership in the respective leases to be unitized is provided by statute.  In section 23.2(b) of the Illinois Oil and Gas Act, the legislature provided that owners' agreements approved by the Department are authorized.  225 ILCS 725/23.2(b) (West 1998).  Further, section 23.15 of the Illinois Oil and Gas Act states:

"(1) Property rights, leases, contracts[,] and all other rights and obligations affecting oil and gas rights within the unit area shall be regarded as amended and modified to the extent necessary to conform to the provisions and requirements of this Act and to any valid and acceptable plan of unitization or order of the Department ***.

(2) ***  The unit production and the proceeds from the sale thereof shall be owned by the several persons to whom the same is allocated under the plan of unitization."  225 ILCS 725/23.15(1) (West 1998).

See also 225 ILCS 725/23.3 (West 1998) (authorizing the Department to give notice of public hearing to and consider petitions containing names of owners of interest in the oil and gas rights in the proposed unit area); 225 ILCS 725/23.8 (West 1998) (requiring approval of the plan by persons owning at least 51% of the unit production and by those who will pay at least 51% of the unit expense).  

As enumerated by the Department at the hearing in the underlying case, the Department's order determines that the allocation of unit production is fair to all owners of the oil and gas rights in the unit area, the determination of unit allocation is fair and reasonable and equitable to the working unit owners, and the compensation for wells and other properties of working interest owners is fair and reasonable and equitable.  See 225 ILCS 725/23.5 (West 1998).  The Department could hardly be expected to fulfill its statutory duties without determining ownership interests in Boulder Field.

The Department had competent jurisdiction and statutory authority to render a final judgment on the merits of whether Schofield acquired an interest in lease B, and its determination was made in a proceeding that was adjudicatory, judicial, or quasi-judicial in nature.  The Illinois statutory scheme provided the Department with the inherent authority to issue an order identifying ownership in Boulder Field, and its authority was not lost because Schofield failed to fully assert the issue at the unitization hearing.  Schofield was given notice of the proceeding and presented its objection through a letter to the Department.  Schofield's representative was apprized of Schofield's contention of ownership in lease B of Boulder Field.  The Department rejected Schofield's objection, as shown in the final order crediting Schofield only with its interest in lease A.  With personal jurisdiction, subject matter jurisdiction, and inherent authority under the statute to render a decision concerning ownership of the unit, the final decision of the Department, following the unitization hearing, barred Schofield's subsequent suit concerning its ownership of lease B in Boulder Field under the doctrine of 
res judicata
.

Specific performance

Alternatively, however, we reject on the merits Schofield's claim to lease B.  Schofield, as the assignee of Wilson's interest, stands in Wilson's position in this appeal for the following reason:

"It is well settled in Illinois that when a valid assignment is effected, the assignee (1) acquires all of the interest of the assignor in the property that is transferred and (2) stands in the shoes of the assignor [citation].  Moreover, the assignee *** takes the assignor's interest subject to all legal and equitable defenses existing at the time of the assignment."  
Stavros v. Karkomi
, 39 Ill. App. 3d 113, 122 (1976).

The conveyance of the right to enter upon the land for the purpose of prospecting and operating for oil and gas is a conveyance of an interest in the land itself.  See
 Jilek v. Chicago Wilmington & Franklin Coal Co.
, 382 Ill. 241 (1943); 
Transcontinental Oil Co. v. Emmerson
, 298 Ill. 394, 403 (1921).  Contracts conveying land or an interest therein are required to be in writing pursuant to the statute of frauds, which provides as follows:

"No action shall be brought to charge any person upon any contract for the sale of lands, *** or any interest in and concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing[] and signed by the party to be charged therewith ***."  740 ILCS 80/2 (West 1998).

Specific performance is a remedy resting in the sound discretion of the court to be determined from all of the facts and circumstances.  See 
Pocius v. Fleck
, 13 Ill. 2d 420, 426 (1958).  Before a court may exercise its discretion in favor of granting specific performance of an oral contract which would normally be unenforceable under the statute of frauds, the court must find that the terms of the contract are clear, definite, and unequivocal, that the contract has been at least partially performed by the party seeking the remedy, and that the acts allegedly done in performance are positively attributable exclusively to the contract.  See 
Intini v. Marino
, 112 Ill. App. 3d 252, 256 (1983); 
Blaise v. Stein
, 75 Ill. App. 3d 793, 796 (1979).  Furthermore, the party seeking the application of equitable principles to defeat the interposition of the statute of frauds must establish that the promisee cannot be made whole by damages or by another adequate remedy at law.  See 
Alguire v. Walker
, 154 Ill. App. 3d 438, 443 (1987).    

In his cross-appeal, Nikkel argues that the trial court's finding that there was an oral agreement between Nikkel and Wilson that Wilson would receive a 1/64 of 75% carried working interest in the entire Boulder Field in exchange for Wilson's performance of geological services was not supported by clear and convincing evidence.  Nikkel also argues that the trial court improperly relied on custom-and-practice evidence to establish the oral agreement between Nikkel and Wilson, as opposed to using it merely to explain an ambiguous or uncertain term of the agreement.

Nikkel further contends that if Wilson and Nikkel entered into an oral agreement, it was unenforceable under the statute of frauds because the purpose of the oral agreement was to convey real estate as compensation for personal services and because the equitable remedy of specific performance is not available where the value of those personal services can be reasonably compensated.  We agree with Nikkel's last contention. 

Assuming, 
arguend
o, that there was clear and convincing evidence of the oral agreement between Nikkel and Wilson and that the custom-and-usage evidence was properly admitted to explain the agreement, we nevertheless find for Nikkel because Wilson could have been, and was in fact, adequately compensated at law, and Schofield's claim for specific performance therefore fails.

Although an oral contract to transfer real estate is generally unenforceable under the statute of frauds, part performance is an equitable doctrine that can remove the oral contract to convey land from the operation of the statute of frauds.  See 
Leekha v. Wentcher
, 224 Ill. App. 3d 342, 349 (1991).  Oral contracts to convey real estate are therefore enforced in equity where the contract has been fully performed by one party, but performance must be such that if the remedy is withheld it would be a fraud upon the promisee if not carried out.  See 
Pocius
, 13 Ill. 2d at 426.

The rendition of personal services, the value of which may be pecuniarily estimated or which can be adequately compensated at law, will not remove from the operation of the statute of frauds an oral contract to convey an interest in land in exchange for such services.  See 
Faulkner v. Black
, 378 Ill. 112, 118-19 (1941).  Specific performance will not be granted where there is an adequate remedy at law, such as money damages, unless there is some element to show that the relief at law might not be adequate, such as where the measure of damages resulting from nonperformance of the agreement is uncertain or difficult to ascertain.  See 
In re Estate of Johnson
, 39 Ill. App. 3d 246, 253 (1976).      

In 
Fowley v. Braden
, 4 Ill. 2d 355, 356 (1954), the plaintiffs filed a complaint seeking to establish the ownership of undivided interests in four oil and gas leases.  The plaintiffs asserted that they were engaged in developing and producing oil and that they raised funds to pay for and to drill a test well on the leases.  See 
Fowley
, 4 Ill. 2d at 356.  The plaintiffs contended that a verbal agreement was made whereby the plaintiffs were to assist in raising funds for the purchase of the oil and gas leases and that the profits, either in cash, oil, or unsold interest in the leases, would be divided equally between the plaintiffs and the defendants.  See 
Fowley
, 4 Ill. 2d at 356.  The plaintiffs asserted that they went to Chicago, contacted investors, raised $7500 by the sale of 27/64 of the working interest in the leases to outside parties, advanced expenses to the defendant, and helped acquire the leases and the well to be drilled.  See 
Fowley
, 4 Ill. 2d at 356-57.  The plaintiffs in 
Fowley
 maintained that their complete performance under the oral contract rendered the contract not subject to the bar of the statute of frauds.  
Fowley
, 4 Ill. 2d at 362.  

The Illinois Supreme Court in 
Fowley
 denied specific performance of the oral agreement to convey the interest in the oil and gas leases in exchange for the plaintiff's services as promoters.  
Fowley
, 4 Ill. 2d at 363.  The court explained that the plaintiff's "loss consisted almost entirely of an opportunity to make a profit which could be estimated and was compensable in an action at law."  
Fowley
, 4 Ill. 2d at 363.  The court held, therefore, that the personal services, the value of which could be estimated, did not take the contract out of the statute of frauds because the law afforded an adequate remedy.  See 
Fowley
, 4 Ill. 2d at 363.  In the case 
sub judice
, we find that Wilson's services can be adequately compensated at law.  Wilson testified at trial that his hourly charge for services was $25 and he and his assistant performed approximately 80 hours of work each on the Boulder Field project.  The value of Wilson's personal services therefore equaled approximately $4,000.  After he had received $2,000 to $3,000 from his interest in lease A of Boulder Field, Wilson received $9,500 from Schofield for Wilson's assignment to Schofield.  Wilson therefore received approximately $12,000 in exchange for $4,000 in geological services. 

Furthermore, Schofield has received $10,000 via its interest in lease A, and John O. Schofield testified that the corporation's interest in lease A at the time of trial was valued at approximately $402,575.  Wilson and, as Wilson's assignee, Schofield were adequately compensated at law for Wilson's services.  Granting specific performance requiring Nikkel to convey to Wilson, and ultimately Schofield, an interest in lease B of Boulder Field is unwarranted.  Wilson can be adequately compensated for his services through money damages and has, in fact, been compensated through Nikkel's assignment of interest to Wilson in lease A.  Thus, because we find that Wilson was adequately compensated by monetary means and that Schofield retains no interest in lease B, we need not address whether Schofield's acceptance of lease A proceeds ratified the division order and constituted an estoppel in asserting its interest in lease B.  

Because a court of review is not bound to accept the reasons given by a circuit court for its judgment,  and the judgment may be sustained upon any ground warranted, regardless of whether the circuit court relied upon such ground and regardless of whether the reason given by the circuit court was correct (see 
Messenger v. Edgar
, 157 Ill. 2d 162, 177 (1993)), we therefore affirm the trial court's ruling that Schofield is not entitled to an interest in lease  B of Boulder Field.  Contrary to the trial court's decision, Schofield was barred from raising its claimed interest in lease B, by operation of the doctrine of 
res judicata
.  Alternatively, we find that Wilson's performance could be adequately compensated through money damages, and therefore, the equitable remedy of specific performance of the oral contract to convey lease B, in addition to the already-conveyed interest in lease A, was not warranted. 

CONCLUSION

For the foregoing reasons, we affirm the trial court's decision in favor of Nikkel and against Schofield.

Affirmed.

GOLDENHERSH, P.J., and KUEHN, J., concur.