# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-3216

TRUSTMARK INSURANCE COMPANY,

*Plaintiff-Appellant*,

*v.*

GENERAL & COLOGNE LIFE RE OF AMERICA,
formerly known as COLOGNE LIFE
REINSURANCE COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1926—**Blanche M. Manning**, *Judge*.

ARGUED FEBRUARY 7, 2005—DECIDED SEPTEMBER 13, 2005

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Surely, if there is any moral to this story, it is to "get it in writing." It is astounding in this day and age to find it necessary to repeat this admonition, but no less so than to find a sophisticated party willing to leverage an agreement involving multiple years and millions of dollars solely on the enforceability of a simple handshake. Yet that is precisely what has happened in this case. Plaintiff Trustmark Insurance Company ("Trustmark") brought suit against defendant General & Cologne Life Re of America ("Cologne"), another insurance

company, over an alleged reinsurance deal that was not committed to writing.

Nonetheless, Trustmark presses its claims under theories of breach of contract, breach of fiduciary duty, and promissory estoppel, alleging that Cologne breached an unwritten joint-venture agreement and amorphous promises to acquire a block of individual disability insurance ("IDI") policies. The district court granted partial summary judgment in Cologne's favor on the breach of contract and breach of fiduciary duty claims, finding no joint-venture because the parties did not exercise mutual control over a joint enterprise. The court further found, in entering final judgment in favor of Cologne after a subsequent bench trial, that plaintiff's promissory estoppel claim was barred by the statute of frauds. Because we find that plaintiff has failed to proffer sufficient evidence of mutual control over a joint-venture, and that the availability of an adequate remedy at law precludes Trustmark from invoking the partial performance exception to the statute of frauds, we affirm both rulings.

## I. BACKGROUND

In early 1998, Trustmark and Cologne jointly investigated, with a view toward acquiring, a block of 7000 IDI policies offered for sale by Hartford Life Insurance Co. (hereinafter, "the Hartford Block" or "the Block"). In the course of their investigation, the record suggests that these parties talked about a lot of things that would happen in the event of a successful purchase of the Block. They talked about sharing profits and the risk of loss. They even talked about Trustmark taking on the responsibility for administering claims on the purchased policies, as Cologne lacked the capacity to do so itself. The problem is, none of this talk was committed to writing.

Despite having no written agreement—even as to how

this investigation itself would proceed—the parties together performed the actuarial work and due diligence necessary to determine a purchase price for the proposed acquisition. Negotiations over the purchase, however, took place solely between Trustmark and Hartford. These negotiations bore fruit on October 28, 1998, when, after some back and forth, Trustmark and Hartford signed a letter of intent on the sale of the Block. Although Cologne had reviewed, commented on, and approved this letter of intent, it did not sign the letter and its name is not mentioned anywhere. On its face, the letter sets forth a relationship solely between Trustmark and Hartford.

In conjunction with the letter of intent, Trustmark also entered into a separate claims-administration agreement with Hartford, immediately conferring upon Trustmark the responsibility for administering claims on the purchased policies after signing the letter of intent. Trustmark did not consult Cologne regarding the terms of this separate agreement, nor did it seek the defendant's approval of the document prior to its execution. This separate agreement makes no mention of Cologne whatsoever.

Notwithstanding Cologne's omission from the operative paperwork, over the next ten months while the final purchase documents were being drafted, representatives of Cologne and Trustmark continued to speak as if the defendant was still a part of the deal. For example, in sales pitch letters to third parties dated December 30, 1998, and February 9, 1999, Andrew Perkins, Senior Vice President of Cologne's Individual Health Group, referred to the Cologne and Trustmark as "successful partners" in the purchase of the Hartford Block. On February 23, 1999, Perkins sent a draft of the Coinsurance/Assumption Reinsurance Agreement between Trustmark and Hartford to his assistant with a handwritten note stating

"we'll end up with a retro[1] to us from Trustmark, following this language." In addition, Cologne made several reassurances to Trustmark between February and July 1999—in the face of mounting losses on the Hartford acquisition—that it remained committed to sharing the risk on the Hartford Block. But, throughout all this, the final purchase agreement with Hartford had yet to be finalized and signed, and Cologne's name had yet to appear formally on paper.

On September 3, 1999, after learning of additional and substantial losses on the Block, but prior to final consummation of the acquisition, Cologne informed Trustmark that it would not go forward with the purchase. Cologne claims that its decision to renege was based on Trustmark's poor ability to administer policy claims; the failure of the parties to agree upon or even discuss Trustmark's compensation for administering claims (a figure that would determine how much premium Cologne would receive on the back end); and the delay of Trustmark and Hartford, by the terms of their own letter of intent, in entering into a "definitive agreement" on the Block purchase. Each of these items, according to Cologne, were understood conditions to its involvement in the deal. Trustmark claims the decision to renege came upon Cologne's discovery that Hartford Block was losing a lot of money. Whatever the reason, Cologne was out, and Trustmark was unhappy. Notwithstanding this abandonment, Trustmark went on to finalize the purchase from Hartford on December 28, 1999.

In February 2000, Trustmark brought suit against Cologne under five counts. Under Count I, Trustmark sought a declaratory judgment that Cologne was obliged to reinsure Trustmark on the Hartford Block in accordance

---

[1] Refering to a "retrocession," which is a transfer of risks assumed by one reinsurer to a second reinsurer.

with an alleged joint-venture agreement. Count II sought specific performance on this alleged joint-venture agreement. Count III sought damages for breach of the alleged joint-venture agreement, while Count IV sought damages for breach of fiduciary duty. Count V claimed damages under a theory of promissory estoppel. In October 2001, the district court granted the defendant's motion for summary judgment as to Counts I through IV, rejecting those counts premised on the existence of a joint-venture agreement as a matter of law. In particular, the court found that Trustmark had failed to show that the parties had maintained joint control over an IDI policy purchasing enterprise. The court also denied a motion by Trustmark to amend its complaint to add a claim of "equitable estoppel," finding that the plaintiff failed to show good cause to add the claim more than nine months after the deadline for amending pleadings, and that such a late amendment would prejudice the defendant by necessitating additional discovery.

This left Trustmark with only its promissory estoppel claim, which survived Cologne's statute of frauds challenge at summary judgment only by virtue of the potential applicability of the doctrine of partial performance. Otherwise, the district court determined that the statute of frauds applied to the alleged joint-venture promise at the heart of Trustmark's promissory estoppel claim, and there was no writing to satisfy the statute's prescriptions. With the statute of frauds bar so avoided, however, the district court found that Trustmark had created a genuine issue of fact as to whether Trustmark entered into the letter of intent with Hartford in reliance on Cologne's alleged promise to join in the purchase of the Block.

In June 2002, however, Cologne requested that the district court reconsider its October 2001 order with respect to Trustmark's promissory estoppel claim. In particular, the defendant noted that the doctrine of partial perfor-

mance, upon which the plaintiff's only surviving claim relied, is an equitable doctrine. Trustmark's promissory estoppel claim, in contrast, explicitly sought damages. Though the court agreed that the doctrine of partial performance could not save Trustmark's promissory estoppel claim to the extent it sought monetary damages, it found the claim could nonetheless survive because it had incorporated the requests for equitable relief sought in the other (dismissed) counts—namely the declaratory judgment and specific performance sought in Counts I and II, respectively. Accordingly, the promissory estoppel claim received a bench trial in April 2003.

After the bench trial, the district court entered final judgment in favor of Cologne on August 3, 2004, finding that the ability to quantify the extent of Trustmark's loss on the Hartford Block left the plaintiff with an adequate remedy at law—thereby precluding equitable relief and reliance on the equitable doctrine of partial performance to preserve the promissory estoppel claim. Trustmark appeals both this final entry of judgment, and the prior grant of partial summary judgment.

## II. ANALYSIS

### A.  Cologne and Trustmark Did Not Exercise Sufficient Mutual Control to Establish a Joint-Venture

Trustmark first challenges the district court's entry of partial summary judgment on its joint-venture claims (Counts I through IV). "We review a district court's decision to grant a motion for summary judgment *de novo*, construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Telemark Dev. Group, Inc. v. Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002). Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In granting partial summary judgment, the court found that the parties were not engaged in a joint-venture when they worked in concert to acquire the Hartford Block. To establish a joint-venture under governing Illinois law, a party must prove:

> (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profits and losses.

*Minyo v. Minyo*, 581 N.E.2d 170, 173 (Ill. App. Ct. 1991) (citing *Ambuul v. Swanson,* 516 N.E.2d 427 (Ill. App. Ct. 1987)). Here, the controversy centers around the fourth element—mutual control over a joint enterprise.

As a threshold matter, there is some discrepancy as to the scope of the enterprise over which the parties allegedly exerted control. Trustmark insists that the joint-venture at the heart of its claim extended only to the purchase of the Hartford Block, and not, as the district court reasoned, to the purchase of IDI policies *in general*. Indeed, the size of the enterprise may bear on a plaintiff's burden in establishing the control element, for the bigger the enterprise, the more sweeping the requisite control; and the more sweeping the control, the more the plaintiff would have to establish to survive summary judgment. Thus, Trustmark argues that the district court erred when it grounded its dismissal of the breach of contract claim in part on the parties' inability to control

each other's activities in pursuing IDI policies in general. This argument, however, belies the allegations of Trustmark's own complaint, which by its own terms describes the joint-venture as existing "for the purpose of acquiring large blocks of IDI policies from *various* insurance companies." Compl. at 3 (emphasis added). In any event, how great or small the scope of the averred enterprise is of little consequence here, for, whether the enterprise's end be IDI policies in general or merely the Hartford acquisition in particular, the record remains devoid of any evidence of mutual control.

Trustmark's only hope to establish a genuine issue of material fact regarding mutual control rests on Cologne's involvement in drafting the letter of intent that bound Trustmark to proceed with the acquisition of the Hartford Block. Cologne was unquestionably involved in the letter's drafting: the company reviewed, commented on, and ultimately approved the terms reflected in the letter of intent, and its subsidiary, JHA, is credited with determining the purchase price for the block provided in the letter. But this involvement does not, as Trustmark contends, exhibit Cologne's control over the purchase of the Block. Cologne's asserted involvement here occurred well before Trustmark entered into the final purchase agreement with Hartford, during the preliminary stages of the purchase negotiations. Indeed, "Illinois . . . allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics." *Empro Mfg. Co. v. Ball-Co. Mfg., Inc.*, 870 F.2d 423, 426 (7th Cir. 1989). Cologne's consultations and involvement at this stage, while not insignificant, remain best characterized as its thorough investigation of a business opportunity, and its approval of terms as a preliminary understanding of that opportunity's contours. Review and comment on documents that shape preliminary under-

standings of deals yet to be finalized do not amount to an exercise of control.

Trustmark next cites *Herst v. Chark*, 579 N.E.2d 990 (Ill. App. Ct. 1991) for the proposition that mutual control necessary to establish a joint-venture will be found where the parties divide responsibilities along functional lines. Reading *Herst* so, Trustmark argues that such responsibility divisions were made here—with Cologne performing due diligence on the underwriting of the Hartford Block; Cologne's subsidiary (JHA) determining the acquisition's purchase price; Trustmark and JHA undertaking due diligence on Hartford's claims handling; and Trustmark taking sole responsibility for claims administration upon consummation of the purchase. With this division of responsibilities in mind, the plaintiff insists that a factual issue remains as to mutual control.

Even assuming this division of responsibilities to be accurate, however, Trustmark fundamentally misconstrues the holding of *Herst*. The case does not stand for the proposition that mutual control exists wherever parties divide responsibilities along functional lines. Rather, the case merely notes that the fact that one party was not involved in every aspect of an enterprise does not preclude the finding of a joint-venture. *Id.* at 993-94. Nothing in *Herst* holds that mutual control could exist notwithstanding the inability of either party to exercise control over the other toward achieving the object of the alleged joint-venture.

In the final analysis, neither Trustmark nor Cologne could force the other party to enter into an IDI policy purchase—be it in general or merely for the Hartford Block—nor could they compel the use of each other's employees or resources toward such ends. These parties could not exercise any control over each other's operations or policies whatsoever, and therefore we affirm the dis-

trict court's grant of partial summary judgment on the joint-venture claims for lack of mutual control.

## B. Trustmark Proffers no Writings that Could Satisfy the Statute of Frauds

Turning to its promissory estoppel claim, the plaintiff next contends that the district court erred in finding that it had proffered no document to satisfy the writing requirement of the statute of frauds. Because the court made this finding in its October 22, 2001, partial summary judgment ruling, which tied the fate of Trustmark's promissory estoppel claim to the applicability of the doctrine of partial performance, our review is *de novo*. *Telemark*, 313 F.3d at 976.

The Illinois statute of frauds provides that

> [n]o action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1. It is undisputed that Trustmark and Cologne have not entered into a written contract. Furthermore, Trustmark does not dispute the district court's finding that Cologne's alleged promise to reinsure the Hartford Block cannot be performed within one year. And it is clear that "[u]nder Illinois law, the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel." *Fischer v. First Chicago Capital Mkts., Inc.*, 195 F.3d 279, 284 (7th Cir. 1999) (citing *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*, 58 F.3d 1227, 1231 (7th Cir. 1995));

*McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1352 (Ill. 1997) ("[P]romissory estoppel does not bar the application of the statute of frauds in Illinois."). Thus, the issue here is whether Trustmark has proffered a writing sufficient to satisfy the statute of frauds.

"A writing sufficient to satisfy the Statute of Frauds need not itself be a valid contract, but only evidence of one." *Crawley v. Hathaway*, 721 N.E.2d 1208, 1211 (Ill. App. Ct. 1999) (quoting *Melrose Park Nat'l Bank v. Carr*, 618 N.E.2d 839, 843 (Ill. App. Ct. 1993)). Indeed, a sufficient memorandum may be composed of multiple documents of varying forms. *Am. Coll. of Surgeons v. Lumbermens Mut. Cas. Co.*, 491 N.E.2d 1179, 1192 (Ill. App. Ct. 1986). Toward that end, Trustmark has adduced several writings in an effort to satisfy the statute's prescriptions. That said, for multiple writings to satisfy the statute, "all the essential terms [of the contract] must be in writing, and there must be an express reference to the other writings or such a connection between the documents, physical or otherwise, as to demonstrate that they relate to the same contract." *Dickens v. Quincy Coll.*, 615 N.E.2d 381, 384 (Ill. App. Ct. 1993) (citing cases). It is here that the multiple documents proffered by Trustmark fall short, for they neither state essential terms, refer expressly to each other, nor connect in such a way as to reflect relation to a particular contract.

Trustmark first cites the sales pitch letter written by Perkins of Cologne to a third party (Lincoln National Insurance) stating "Cologne and Trustmark have been working jointly in pursuit of non-cancellable disability opportunities and were successful partners in the . . . Hartford acquisition." The plaintiff rightly notes that "letters addressed to a third party, stating and affirming a contract, may be used against the writer as a memorandum of it." *Gaines v. McAdam*, 79 Ill. App. 201 (1898). However, here the letter to Lincoln National neither states any terms of the purported contract between

Trustmark and Cologne (let alone all of them); nor does it affirm the existence of a contract, as it makes explicitly clear that the Hartford deal was still "impending." At best, this letter indicates that Trustmark and Cologne were still in the non-binding, preliminary agreement stage of their negotiations on the Hartford acquisition, at that time merely exploring the possibility of a joint-venture on the Block. And even employees of Trustmark who were intimately involved in the acquisition—such as Leonard Koloms, Trustmark's Corporate Actuary, and Rowen Bell, Trustmark's point man on the letter of intent with Hartford—admit that their own use of the term "partner" was not intended to have any operative legal connotation.

Trustmark also cites the handwritten note penned by Perkins on a draft of the Coinsurance/Assumption Reinsurance Agreement between Trustmark and Hartford. The note states, "[W]e'll end up with a retro to us from Trustmark, following this language." First, the words "we'll end up with" themselves suggest that Cologne had not yet agreed to reinsure Trustmark on the Hartford deal. And, again, the attached draft agreement between Trustmark and Hartford omits several terms that would be essential to a reinsurance deal between Cologne and Trustmark—terms such as Trustmark's share of incoming premium to cover the expense of its administration of policy claims (and in turn that share of premiums Cologne could expect to receive on the back end), or the percentage of risk that Cologne would assume on the Hartford Block.

Cologne's "percentage of risk assumed" would certainly be an essential term in this alleged joint-venture, and, toward that end, Trustmark cites the deposition testimony of Perkins in an attempt to lock down that term in writing. "A deposition may qualify as a signed writing for statute of frauds purposes." *Bower v. Jones*, 978 F.2d 1004, 1009 (7th Cir. 1992). In his deposition, Perkins testified that "it was

[his] expectation that Cologne would reinsure 50 percent of this business from Trustmark." However, he immediately qualified this statement by stating that "Trustmark intended to reinsure [50 percent of] the business with [Cologne] *if the transaction went forward as had been intended.*" (emphasis added). Clearly, Perkins's testimony does not provide, as Trustmark argues, an unconditional commitment to a percentage. To the contrary, it serves as yet further evidence that the purported deal between the parties was not consummated. The same may be said of the July 14, 1999 draft report prepared by Cologne's outside actuaries, Tillinghast-Towers Perrin. While this report does muse that Cologne "is 50% retrocessionaire from Trustmark who has the other 50% and is the administrator," it is also littered with terms revealing that a reinsurance agreement between Cologne and Trustmark on the Hartford deal had yet to be finalized (stating that the "[r]einsurance contracts are not signed yet," and that the "parties are renegotiating").

As for the July 28, 1999, letter from Perkins to Trustmark, forwarding JHA's proposal for the subsidiary's possible involvement in managing claims on the Hartford Block, this writing fails to memorialize a single term that would be essential to a reinsurance agreement. This letter states, "It is critical that significant additional resource [sic] be brought to bear as soon as possible in order to limit our potential losses on this deal." While this letter has everything to do with potential claims management, it has little (if anything) to do with a reinsurance agreement between Trustmark and Cologne. Indeed, there are no reinsurance agreement terms—let alone essential terms— to mine from this document, and it is thus of no use to Trustmark in its efforts to overcome the statute of frauds.

At best, these writings proffered by Trustmark uniformly reveal a reinsurance agreement between the parties yet to be finalized—a deal contemplated, though not necessarily

consummated.[2] Between all these writings, there is only one essential term arguably suggested, and its validity is dubious at best. These documents fall far short of providing all requisite essential terms for a reinsurance agreement, to say nothing of the fact that each fails to reference or connect to the others in a manner that might confirm relation to a common contract.

Together, these documents proffered by Trustmark do make one thing clear: the plaintiff is grasping at straws. How it came to be in this unfortunate predicament—a predicament in which it must cobble together a sufficient writing where none exists—is clear as well. It put itself there. As Trustmark's counsel informed us at oral argument, "reinsurance is something that is often done on a handshake, . . . perhaps resulting in more litigation than it should these days." We may be shocked by the former, but we see first hand the veracity of the latter. Indeed, we dare say, it is quite the understatement. Accordingly, like all those before it, we affirm the district court's finding where

---

[2] We pause briefly to address Trustmark's contention that Cologne has waived its statute of frauds defense by admitting to the existence and terms of the purported agreement. "When . . . there is particularly compelling evidence of the contract's existence, the strictures of the statute of frauds can safely be relaxed, for example in the case of an admission." *Consolidation Servs., Inc. v. Keybank Nat'l Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999). Toward that end, Trustmark cites those same writings proffered herein to satisfy the statute of frauds. However, under Illinois law the admission must be "unequivocal" to constitute waiver of a statute of frauds defense. *See Derby Meadows Util. Co. v. Inter-Continental Real Estate*, 559 N.E.2d 986, 989, 991 (Ill. App. Ct. 1990). Because these writings express at best an expectancy to reinsure Trustmark on the Hartford Block, not an unequivocal admission that it was contractually bound, or had promised, to do so, we find that Cologne's statute of frauds defense has not been waived.

a plaintiff has again failed to adduce written evidence sufficient to satisfy the requirements of the statute of frauds.

### C. Trustmark Cannot Invoke the Doctrine of Partial Performance

Despite Trustmark's inability to adduce a writing or writings sufficient to satisfy the statute of frauds, there are several exceptions to the statute's writing requirement. One such exception, invoked by the plaintiff here in an effort to save its promissory estoppel claim, is the equitable doctrine of partial performance. In its post-bench trial entry of judgment, however, the district court found that Trustmark could not invoke this doctrine because it had an available remedy at law. Trustmark challenges this finding on appeal, arguing that it cannot be adequately compensated by monetary damages. In reviewing a bench trial, conclusions of law are subject to *de novo* review, while findings of fact are subject to the deferential clearly erroneous standard. *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004).

The doctrine of part performance is an equitable doctrine. *Dickens v. Quincy College Corp.*, 615 N.E.2d 381, 385 (Ill. App. Ct. 1993). As such, the doctrine excepts only those actions seeking equitable relief from the writing requirement of the statute of frauds, to the exclusion of those claims where there exists an adequate remedy at law. *See Sjogren v. Maybrooks, Inc.*, 573 N.E.2d 1367, 1368 (Ill. App. Ct. 1991) ("Although acts of partial performance are typically sufficient to take an oral agreement out from under the operation of the Statute of Frauds in an action at equity, such acts do not take an action at law outside the operation of the Statute of Frauds.") (citing cases); *Gibbon v. Stillwell*, 500 N.E.2d 965, 969 (Ill. App. Ct. 1986). Illinois courts further limit the scope of the exception,

holding that "part performance will avoid application of [the Statute of Frauds] only where a party is seeking the equitable remedy of *specific enforcement.*" *Doherty v. Kahn*, 682 N.E.2d 163, 175 (Ill. App. Ct. 1997) (citing *Phillips v. Britton*, 516 N.E.2d 692, 697 (Ill. App. Ct. 1987)) (emphasis added), *abrogated on other grounds by Byung Moo Soh v. Target Mktg. Sys., Inc.*, 817 N.E.2d 1105, 1109 (Ill. App. Ct. 2004).

Here, in order for the plaintiff to invoke the doctrine of partial performance, it must first establish entitlement to equitable relief. And to be entitled to equitable relief, Trustmark must show that it has no adequate remedy at law. *John O. Schofield, Inc. v. Nikkel*, 731 N.E.2d 915, 925 (Ill. App. Ct. 2000) ("[T]he party seeking the application of equitable principles to defeat the interposition of the statute of frauds must establish that the promisee cannot be made whole by damages or by another adequate remedy at law.").

Under Illinois law, "damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation or conjecture." *Platinum Tech, Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 933 (7th Cir. 2002). Trustmark insists that money damages would be inadequate here because its future loss on the Hartford Block cannot be calculated with requisite certainty considering (1) the volatility of the policies of the Block, (2) the extended period of time covered by those policies, and (3) putative legal barriers that ostensibly prohibit that award of future damages on contracts of indemnity (to which Trustmark contends its reinsurance agreement to be akin).

Contrary to its arguments regarding the hopeless uncertainty of future damages, however, is the trial testimony of Trustmark's own damages and actuarial sciences expert. This expert testified that "a best estimate of the actual

losses on the Hartford block at some point in the future" could be calculated by using a "gross premium valuation." This testimony went uncontested. And though the testimony suggests the availability of nothing better than a "best estimate," "the law only requires there be an adequate basis in the record for the court's determination of [damages], and absolute certainty is unnecessary." *Moniuszko v. Moniuszko*, 606 N.E.2d 468, 474 (Ill. App. Ct. 1992); *see also SNA Nut Co. v. The Haagen-Daz Co., Inc.*, 302 F.3d 725, 733 (7th Cir. 2002) ("[C]ertainty as to the amount of damages goes no further than to require a basis for a reasoned conclusion."); *Jabat, Inc. v. Smith*, 201 F.3d 852, 857 (7th Cir. 2000) ("In Illinois, the evidence need only tend to show a basis for the computation of damages with a fair degree of probability.").

Nor should the plaintiff take umbrage with the propriety of using an actuarial model—such as the gross premium valuation—to calculate future damages. Such models are not only well accepted in courts throughout the land, but also staples of the plaintiff's own industry. *Peoples Security Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 148 (4th Cir. 1993) ("Actuarial tables are the life's blood of the life insurance industry. It is disingenuous for [the defendant] to question the accuracy of the very methodology employed by the industry in issuing its policies simply because actuarial tables were used to determine [an adverse award]."); *MacGregor Yacht Corp. v. State Compensation Ins. Fund*, 63 Cal. App. 4th 448, 460 (1998) ("There was nothing speculative about the actuary's damage analysis. He used the same formulas used by the insurance industry . . . ."). It is odd—or, in the very least, counterintuitive—considering the nature of the business, to find an insurance company complain of the speculative nature of actuarial tables, or to learn that an insurer of risk believes future loss cannot be reliably predicted. In any event, it suffices to say that Trustmark's damages could be

calculated with requisite certainty under Illinois law, and for that reason the company could avail itself of an adequate remedy at law. Accordingly, Trustmark cannot invoke the doctrine of part performance to avoid the preclusive bite of the statute of frauds, and thus its promissory estoppel claim must fail.

### D. District Court Did Not Abuse its Discretion in Denying Motion to Amend Complaint

Finally, we address Trustmark's appeal of the district court's denial of its motion for leave to amend its complaint to add a claim of equitable estoppel. We review such rulings for abuse of discretion. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. United States*, 367 F.3d 650, 668 (7th Cir. 2004). To amend a pleading after the expiration of the trial court's Scheduling Order deadline to amend pleadings, the moving party must show "good cause." Fed. R. Civ. P. 16(b). As our sister circuit succinctly stated, "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking amendment." *Johnson v. Mammouth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Here, nine months after the prescribed deadline of June 30, 2000, Trustmark sought leave to amend its complaint to add a claim of equitable estoppel based on allegations that Cologne, through its subsidiary (JHA), failed to perform adequate due diligence on the Hartford Block, resulting in an overvaluation of the policies. In an effort to show good cause for the amendment, the plaintiff contends that it did not confirm its suspicions of this misrepresentation—and thus the facts supporting its equitable estoppel claim—until April 26, 2001, when the depositions of both a JHA employee involved in the valuation (DeMarco) and Cologne's actuarial experts were completed.

However, Trustmark concedes that it harbored suspicions

that JHA had misrepresented the value of the Hartford Block prior to these depositions, and in fact the deposition testimony of Trustmark's actuarial (Daniel Winslow) reveals that the company was concerned about the quality of DeMarco's valuation work as early as the end of 1999—months before the plaintiff filed its original complaint against Cologne. Based on this testimony, the district court found that Trustmark failed to show good cause for its failure to amend its complaint in a timely manner, finding that Trustmark was, or should have been, aware of the facts underlying its equitable estoppel claim as early as 1999. In so doing, the court did not abuse its discretion, and we affirm the denial of leave to amend accordingly.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of partial summary judgment in Cologne's favor on Trustmark's breach of contract and breach of fiduciary duty claims, its denial of Trustmark's motion for leave to amend its complaint, and its entry of final judgment on the promissory estoppel claim.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*