In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3811

AUTOMOTIVE FINANCE CORPORATION,

*Plaintiff-Appellee,*

*v.*

SMART AUTO CENTER, INC. AND CARL SCHWIBINGER,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00 C 556—**Larry J. McKinney,** *Chief Judge.*

ARGUED MAY 19, 2003—DECIDED JULY 2, 2003

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* This case arises out of the efforts of Automotive Finance Corporation (AFC) to collect on loans it made to Carl Schwibinger, a used car dealer, and Smart Auto Center, Inc., his dealership. Before filing suit, AFC tried a little self-help—repossessing a number of Smart Auto cars and attempting to take others that Schwibinger purchased individually. Smart Auto and Schwibinger (whom we'll refer to together as Schwibinger) filed counterclaims based on these previous collection efforts and, after a bench trial, won about $12,000 in damages. AFC may have lost a couple of battles to

Schwibinger, but it won the war when the district court awarded it roughly $165,000 for the balance of the loans and costs associated with the collection action. Schwibinger appeals.

The agreement between the parties was fairly simple. AFC issued Schwibinger a line of credit to purchase used cars at auto auctions. Each car purchase was treated as a separate loan for the purposes of calculating payment due dates. Schwibinger had to either pay the balance of each loan within 45 days or pay a "curtailment" to extend the loan another 45 days. Once Schwibinger sold a vehicle, he had to repay the loan within 48 hours. If he failed to do so, the vehicle was considered to be "out of trust."

Apparently the used car business was not going well for Schwibinger and, around November 1999, he was behind in his payments and some of his vehicles were out of trust. In December 1999, two representatives from AFC paid him a visit to discuss getting his account current. AFC arranged a "swap out," taking the titles to 11 vehicles that Schwibinger owned outright in exchange for a new loan. The new loan was used to pay off the out-of-trust vehicles and put a second curtailment on the past-due vehicles. AFC did not otherwise alter the payment terms of the note. During the meeting, Schwibinger told AFC that he was selling his dealership and inventory to another car dealer in mid-January.

By the end of December, Schwibinger was again in default and AFC believed that more vehicles were out of trust. Schwibinger attempted to put off AFC's collection efforts. He sent AFC a check that bounced (although he later made good on it), and he made promises (which he didn't keep) that he would wire AFC payments, deliver cashier's checks, send confirmation of the sale of the dealership, and fax copies of payment checks. AFC's regional manager, Chad Hopkins, told Schwibinger to

relinquish possession of the vehicles that served as collateral for the loans. Although Schwibinger initially agreed, he later changed his mind.

At this point, AFC decided to take matters into its own hands. On January 18, 2000, it sent America Auto Recovery (AAR) to Schwibinger's lot to repossess vehicles. Schwibinger arrived on the scene after AAR had taken 16 vehicles. While his wife called the police, Schwibinger pursued a more confrontational strategy. He blocked the driveway with his car and confronted the AAR tow truck drivers. An altercation ensued and, once the sheriff's department arrived, Schwibinger was arrested for disorderly conduct. AAR repossessed 4 more vehicles for a total of 20. Because the repossessed vehicles didn't cover the outstanding loan balance, AFC also attempted to take four vehicles in North Dakota that Schwibinger owned individually.

In March 2000, Schwibinger tried to settle his differences with AFC, offering it roughly $265,000 to cover the amount owed on the vehicles and fees for the repossession. The money was to come from the sale of Smart Auto, and Schwibinger wanted AFC to give his attorney the vehicles under a bailment agreement until the deal closed. AFC requested a hold harmless clause in the agreement for any claims based on the repossession, but Schwibinger refused. Ultimately, the deal fell through.

AFC sold nine of the repossessed vehicles at auto auctions. As it turns out, the 11 other vehicles had odometer or title problems because they were from Canada. These vehicles would not have fetched a good price at an auction because they would have had to be sold "mileage unknown." Therefore, AFC sold these cars to a dealer (with whom it had a lending relationship) who knew how to handle Canadian vehicles with unknown mileage. AFC received $160,000 for all of the vehicles, leaving a loan balance due of $117,000.

AFC brought suit to recover the remaining balance on the loans plus costs and fees associated with collection. Schwibinger responded that he had not defaulted on the loans and AFC failed to mitigate its damages by refusing to allow him to redeem his vehicles and then selling them for too low a price. He also counterclaimed that AFC had repossessed the vehicles over his objection and interfered with his ownership of other vehicles. Following a bench trial, the district court found that AFC was entitled to repossess the vehicles because Schwibinger had been in default on the loans and that it had properly handled the vehicles after repossessing them. Schwibinger was entitled to damages, however, for the four cars that AAR had taken over his objection and for AFC's attempt to take the North Dakota cars that Schwibinger had purchased individually. Schwibinger appeals both the court's holding as to AFC's claim and its determination of the amount of damages to award him on his claims.

We review the district court's findings of fact for clear error and its legal conclusions *de novo*. *See Cerros v. Steel Tech, Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002). To set aside a finding of fact, we must have "a definite and firm conviction that a mistake has been committed." *Cohen Dev. Co. v. JMJ Prop., Inc.*, 317 F.3d 729, 735 (7th Cir. 2003) (citations omitted). In a case arising under our diversity jurisdiction, we apply the law of the forum state, *Merrill v. Trump Indiana, Inc.*, 320 F.3d 729, 731 (7th Cir. 2003), and here that's Indiana.

We'll start with Schwibinger's arguments relating to AFC's claim. Schwibinger says that he didn't default on the loans and, even if he did, AFC did not properly handle the vehicles that it repossessed. We can quickly put Schwibinger's first contention, that he was not in default on the loans, to rest. The gist of this theory is that AFC told Schwibinger that his payment deadlines were

extended to January 20, 2000, and, under the doctrine of equitable estoppel, AFC should be barred from relying on an earlier payment deadline or enforcing the 48-hour payment rule for sold vehicles.

To be successful on an equitable estoppel defense, Schwibinger must show, among other things, that AFC either concealed or made a misrepresentation regarding the payment deadlines, that he was ignorant of the possibility that AFC would enforce the earlier payment deadlines, and that he relied on AFC's misrepresentations to his detriment. *See Clark v. Crowe*, 778 N.E.2d 835, 840 (Ind. Ct. App. 2002) (setting out elements of equitable estoppel). The district court found that AFC didn't say it was changing the note's repayment terms and that Schwibinger's attempts to pay off the loans prior to January 20, 2000, show that he knew he had to pay before that date. We agree. Chad Hopkins, the AFC regional manager who visited Schwibinger in December, said that he didn't verbally agree to alter the payment terms of the note, and the note itself says that it can only be modified in writing. The only writings that Schwibinger points to are an email from Brian Geitner, AFC's vice-president of operations for the Midwest, approving the swap-out agreement and a December 6, 1999, AFC document discussing the details of Schwibinger's account. The Geitner email said that the swap-out gave Schwibinger an extra 30 days to move his inventory—which would have changed the payment dates to early January, not January 20. The December 6, 1999, AFC document did say that payments were due on January 20, but those dates were created as a result of a glitch in AFC's computer systems. AFC sent Schwibinger a corrected document the next day. Even if these writings showed that payments on unsold vehicles had been extended, Schwibinger doesn't point to any writing or representation from AFC giving him more than the standard 48

hours to pay off loans on the vehicles that he sold. In addition, the district court heard testimony that Schwibinger promised to pay off vehicles on several occasions prior to the repossession and agreed to voluntarily relinquish some vehicles in January—showing that he knew that his account was delinquent. These facts don't add up to equitable estoppel. Schwibinger was in default on the loans.

Schwibinger next argues that, even if he was in default on the loans, he is entitled to a new trial on damages because AFC mishandled the repossessed vehicles. First, Schwibinger contends that AFC wrongly rejected his offer to buy the cars back because he refused to add a hold harmless clause to the agreement for any claims arising from the repossession. Under the Indiana Uniform Commercial Code, a debtor can redeem collateral by tendering the full amount due. *See* Ind. Code § 26-1-9.1-623. While the Indiana Supreme Court, in an opinion that is a little less than clear, seems to indicate that a creditor may not defeat a debtor's right to redeem his collateral by insisting that redemption be contingent upon signing a release, see *Star Bank, N.A. v. Laker*, 637 N.E.2d 805, 807 (Ind. 1994), a debtor must nevertheless *tender* the full amount due. Schwibinger never did that as his offer was contingent on the sale of his dealership, Smart Auto. He essentially only offered to enter into a new agreement extending his payment time on the loans. What he did falls short of "tendering payment" which requires more than a new promise to perform an existing promise. "Tendering payment" means offering "payment in full of all monetary obligations then due and performance in full of all other obligations then matured," Ind. Code § 26-1-9.1-623, comment 2. Since Schwibinger never tendered payment, AFC was not required to release the vehicles.

Schwibinger also argues that AFC mishandled the repossessed vehicles by failing to dispose of them in a commercially reasonable manner as required by Ind. Code § 26-1-9.1-610(b). The heart of Schwibinger's argument is that AFC didn't get enough money for the vehicles. Even if that is true, it doesn't entitle Schwibinger to victory—AFC did not have to get the best possible price for the collateral. "The fact that a greater amount could have been obtained . . . is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." Ind. Code § 26-1-9.1-627(a). AFC sold nine of the vehicles at auction—its normal method of disposing of repossessed vehicles. This was commercially reasonable because a secured party is protected if it does something in its usual manner on a recognized market, see Ind. Code § 26-1-9-627(b)(1), and, under Indiana law, auctions are typically found reasonable, see *LaSalle Motor Car Sales, Inc. v. Calumet Nat'l Bank*, 440 N.E.2d 9, 12 (Ind. Ct. App. 1982). AFC also acted reasonably with regard to the Canadian vehicles. An auction wouldn't have yielded a good price for them because of their mileage problems, so AFC sold them to someone who knew how to deal with such vehicles. That AFC had a prior relationship with the dealer, without more, does not make the disposal commercially unreasonable. *See id.* at 13.

We now turn to the district court's assessment of Schwibinger's damages. Part of Schwibinger's damages award came from AAR's repossession of some of the vehicles over his objection. The district court determined that Schwibinger arrived at the lot around 10 p.m., after AAR had taken 16 vehicles, and objected to the repossession at that point. AAR should have stopped taking vehicles when Schwibinger objected, but it proceeded to repossess four more. Citing the testimony of AAR's owner,

Eric Pedersen, Schwibinger contends that he and AAR both arrived at the lot around 10 p.m., so AAR didn't have *any* vehicles under its control before he objected. It's true that Pedersen said that he arrived at the lot at 10 p.m. But Pedersen also said that he had been working for an hour before Schwibinger arrived. It seems a little fishy for Schwibinger to rely on Pedersen's helpful evidence (his arrival time) while discounting his harmful evidence (the number of cars he had taken before Schwibinger's arrival). Furthermore, Schwibinger himself wasn't certain he arrived at 10 p.m. He thought it was closer to 10 p.m. than 11 p.m., but he said that the time was "[j]ust a guess." Schwibinger's statement that AAR was "getting ready to remove my cars from the premises" when he arrived does not negate Pedersen's testimony that he had already taken some cars and, in any event, the district court could have chosen to find this testimony not credible. Schwibinger characterizes Pedersen's testimony as ambiguous, but we don't see anything ambiguous about it. It was not clearly erroneous for the district court to conclude that 16 of 20 vehicles were repossessed before Schwibinger arrived and lodged his objection.

The remainder of Schwibinger's damages award came from AFC's attempt to take vehicles that he owned individually. He also says that AFC stopped auctions from selling to him. His damages expert, Margaret Suralik, testified that Schwibinger lost $170,000 due to these actions because he couldn't restock his dealership. The district court awarded him $5,078.32 for AFC's wrongful attempt to repossess the four vehicles, but Schwibinger faults the court for not making any specific findings regarding damages that AFC's actions may have caused him in terms of restocking his dealership. It's true that Federal Rule of Civil Procedure 52(a) requires the district court to "find the facts specially" and the district court did

not address Schwibinger's restocking argument head-on. But we may consider a trial court's failure to make findings of fact nonreversible error if it can be ascertained from the record that the prevailing party was clearly entitled to judgment. *See Donaldson v. Taylor Prod. Div. of Tecumseh Prod. Co.*, 620 F.2d 155, 158 (7th Cir. 1980); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). That's the situation in this case. There's no evidence that AFC controlled whether auction houses sold cars to Schwibinger. One auction house said that it barred Schwibinger from buying cars because he had a reputation as a slow payer and someone who bounced checks. As to the roughly one-month delay in getting the four North Dakota cars, we think it is wholly implausible that this alone caused Schwibinger to lose $170,000 when he sold his dealership. The failure of the district court to make specific findings on this subject constitutes nonreversible error.

For all these reasons, the judgment of the district court is AFFIRMED. One final matter remains: AFC is entitled to appellate attorney fees under its contract with Schwibinger. Within 15 days, AFC should submit a statement of the attorney fees it incurred in connection with this appeal. Schwibinger may, if desired, file an opposing brief within 10 days thereafter.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*